# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| NECA-IBEW HEALTH & WELFARE FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>  Plaintiff,<br><br>vs.<br><br>PITNEY BOWES INC., MURRAY D. MARTIN and BRUCE NOLOP,<br><br>  Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u><br><br><br>October 28, 2009 |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Pitney Bowes Inc. ("Pitney Bowes" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.   This is a federal class action on behalf of purchasers of the securities of Pitney Bowes between July 30, 2007 and October 29, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5.   In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff NECA-IBEW Health & Welfare Fund, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Pitney Bowes during the Class Period and has been damaged thereby.

7. Defendant Pitney Bowes provides mail processing equipment and integrated mail solutions in the United States and internationally.

8. (a) Defendant Murray D. Martin ("Martin") served as Pitney Bowes' President and Chief Executive Officer ("CEO") during the Class Period.

(b) Defendant Bruce Nolop ("Nolop") served as Pitney Bowes' Chief Financial Officer ("CFO") and Executive Vice President ("EVP") during the Class Period.

(c) Defendants Martin and Nolop are collectively referred to herein as the "Individual Defendants."

9. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Pitney Bowes, by virtue of their high-level positions with the Company, directly participated in the management of

the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Pitney Bowes, each of the Individual Defendants had access to the adverse undisclosed information about Pitney Bowes's business prospects and financial condition and performance as particularized herein and knew (or

recklessly disregarded) that these adverse facts rendered the positive representations made by or about Pitney Bowes and its business issued or adopted by the Company materially false and misleading.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Pitney Bowes common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Pitney Bowes' business, operations, management and the intrinsic value of Pitney Bowes common stock; and (ii) caused Plaintiff and other members of the Class to purchase Pitney Bowes common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

15. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased the common stock of Pitney Bowes during the Class Period, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, and at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Pitney Bowes common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Pitney Bowes or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pitney Bowes; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

20.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21.   Defendant Pitney Bowes provides mail processing equipment and integrated mail solutions in the United States and internationally.

22.   The Class Period commences on July 30, 2007. On that date, Pitney Bowes issued a press release announcing its financial results for the second quarter of 2007, the period ending June 30, 2007. Defendant Martin commented on the announcement stating, in pertinent part, as follows:

> We are pleased with our strong second quarter performance which underscores our ability to deliver value to shareholders and customers. This quarter's results were led by the U.S. Mailing, Software and Mail Services segments. The U.S. Mailing segment benefited from sales of equipment that help customers comply with the provisions of the recently-enacted U.S. postal rate case, which require that postage be based on shape as well as weight. Our expanding Software business and our Mail Services operations also had excellent results in the quarter. Lower equipment sales in Europe, as well as weak performance in the legal solutions portion of our Management Services segment, partially offset these positive results. We have put in place marketing programs in Europe that we believe will improve the performance for the remainder of the year. At Management Services we had excellent new written business and we are realigning our legal solutions management and operations, which we expect will improve revenue growth and EBIT margins for the remainder of the year.

The press release provided the Company's "Outlook" stating, in pertinent part, as follows:

> **Outlook**
>
> The company anticipates third quarter revenue growth in the range of 8 percent to 11 percent and revenue growth in the range of 7 percent to 10 percent for the full year.
>
> The company expects earnings per share from continuing operations on a GAAP basis in the range of $0.68 to $0.72 for the third quarter and $2.85 to $2.93 for the full year. Excluding the effect of the accounting alignment for MapInfo, the company

expects adjusted earnings per share from continuing operations in the range of $0.70 to $0.74 for the third quarter and continues to expect $2.90 to $2.98 for the full year

23.     That same day, after the market closed, Pitney Bowes held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made numerous positive statements about Pitney Bowes, its business, operations and earnings prospects.

24.     On August 6, 2007, Pitney Bowes filed its Form 10-Q for the quarter ending June 30, 2007, with the SEC which was signed by Defendant Nolop, among others, and confirmed the previously announced financial results. The Form 10-Q contained the following statement about the Company's Outlook:

> We anticipate that we will experience solid financial results in 2007. We expect our mix of product sales to continue to change, with a greater percentage of revenue coming from diversified revenue streams associated with fully featured smaller systems and a smaller percentage from larger system sales. In addition, we expect to expand our market presence in Mailstream Solutions and Mailstream Services and derive further synergies from our recent acquisitions. We will continue to remain focused on our productivity programs and to allocate capital in order to optimize our returns. As part of the purchase accounting for MapInfo, we aligned MapInfo's accounting policies for software revenue recognition with ours. Accordingly, certain software revenue that was previously recognized by MapInfo on a periodic basis will now be recognized over the life of the contract. Including the effect of this accounting alignment, we expect the acquisition of MapInfo to reduce diluted earnings per share from continuing operations by approximately 5 cents in 2007.

25.     The statements referenced above in ¶¶22-24 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

    (a)     that the Company was experiencing a slowdown in sales of equipment and software and supplies to the financial services sector;

    (b)     that revenues in the Company's U.S. mailing segment had dramatically declined and were not performing according to internal expectations;

7

(c) that the Company's international operations were not performing to internal expectations as market liberalization and deregulation was causing customers to delay purchasing decisions. For example, in France, a change in the method of meter rentals was causing delayed purchasing decisions and increased selling and marketing costs; and

(d) as a result of the foregoing and other adverse undisclosed factors, there was no reasonable basis for Defendants' positive statements about the Company, its operations and earnings.

26. Then, on October 29, 2007, Pitney Bowes issued a press release announcing its financial results for the third quarter of 2007, the period ending September 30, 2007. The Company reported adjusted diluted earnings per share from continuing operations of $0.63 per share which was below the Company's guidance of $.70 to $.74, and that earnings per diluted share from continuing operations on a GAAP basis was $0.58 per share, which was below the Company's guidance of $.68 to $.72. Defendant Martin commented on the results stating, in pertinent part, as follows:

> Business conditions during the third quarter were much more challenging than we originally anticipated. Our Software and Mail Services segments continued to have very strong results, but their performance was offset by weakness in our U.S. and International Mailing segments as well as in our Management Services segment... First, weakness in certain sectors of the economy, such as financial services, is resulting in lower sales of equipment and software as well as lower print and supplies volumes. Second, the postal rate case in the second quarter was a positive event for U.S. Mailing and helped generate significant incremental sales during that quarter. It is now apparent, however, that more of those sales were shifted from what would have normally occurred in future quarters than we had originally anticipated. Additionally, the benefit from meter migration this quarter was less than we expected. Third, in International Mailing, delays in postal liberalization across Europe are creating a more difficult environment in the postal sector and are impacting customer purchases. The EBIT margin for International Mailing was adversely impacted by both the lower revenue growth and greater than anticipated expenses associated with our outsourcing contracts for European back office operations. And finally, at Pitney Bowes Management Services, the benefit from the strong written business in prior quarters was offset by continuation of weak results in legal solutions and delays in government outsourcing contracts.

27. That same day, after the market closed, Pitney Bowes held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants admitted that a host of factors caused Pitney Bowes to drastically miss the earnings they had promised.

28. In response to the Company's announcement, the price of Pitney Bowes common stock declined from $42.68 per share to $36.27 per share on extremely heavy trading volume.

29. On February 13, 2008, Pitney Bowes issued a press release announcing, among other things, that Defendant Nolop was being replaced as CFO and would be leaving the Company.

30. The market for Pitney Bowes common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Pitney Bowes common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Pitney Bowes common stock relying upon the integrity of the market price of Pitney Bowes' common stock and market information relating to Pitney Bowes, and have been damaged thereby.

31. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Pitney Bowes' common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

32. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading

9

statements about Pitney Bowes's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Pitney Bowes and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the truth about the Company was revealed and the inflation in the price of Pitney Bowes's stock was removed.

### Additional Scienter Allegations

33. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Pitney Bowes, their control over, and/or receipt and/or modification of Pitney Bowes' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Pitney Bowes, participated in the fraudulent scheme alleged herein.

### Applicability of Presumption of Reliance: Fraud on the Market Doctrine

34. At all relevant times, the market for Pitney Bowes' common stock was efficient for the following reasons, among others:

(a) Pitney Bowes stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

10

      (b)    As a regulated issuer, Pitney Bowes filed periodic public reports with the SEC and the NYSE;

      (c)    Pitney Bowes regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (d)    Pitney Bowes was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

    35.    As a result of the foregoing, the market for Pitney Bowes common stock promptly digested current information regarding Pitney Bowes from all publicly available sources and reflected such information in Pitney Bowes' stock price. Under these circumstances, all purchasers of Pitney Bowes' common stock during the Class Period suffered similar injury through their purchase of Pitney Bowes' common stock at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

    36.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. There were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Indeed, Defendants simply referred investors to a very short boilerplate recitation of general business risks that could apply to any business operating in the same business as the Company. This list of so-called risk factors did not meaningfully advise investors of the adverse factors then negatively

impacting Pitney Bowes' business which made its stated earnings guidance unattainable. Furthermore, Defendants are liable for their false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Pitney Bowes who knew that those statements were false when made.

### FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

37.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

38.  During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39.  Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

40.  Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pitney Bowes common stock. Plaintiff and the Class would not have purchased Pitney Bowes common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

41. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Pitney Bowes common stock during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

42. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43. The Individual Defendants acted as controlling persons of Pitney Bowes within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Pitney Bowes, and their ownership of Pitney Bowes stock, the Individual Defendants had the power and authority to cause Pitney Bowes to engage in the wrongful conduct complained of herein.

44. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and Plaintiff's counsel as Lead Counsel and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED: October 28, 2009

DISERIO MARTIN O'CONNOR &
  CASTIGLIONI LLP
JONATHAN P. WHITCOMB

_____
Jonathan P. Whitcomb

One Atlantic Street
Stamford, CT 06901
Telephone: 203/358-0800
203/348-2321 (fax)

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
JOSEPH RUSSELLO
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

CAVANAGH & O'HARA
PATRICK J. O'HARA
407 East Adams Street
Springfield, IL 62701
Telephone: 217/544-1771
217/544-9894 (fax)

*Attorneys for Plaintiff*