**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **NECA-IBEW HEALTH & WELFARE FUND,** | : | |
| **Individually and On Behalf of All Others** | : | |
| **Similarly Situated,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.** |
| | : | **3:09-CV-01740 (VLB)** |
| **v.** | : | |
| | : | |
| **PITNEY BOWES INC., MURRAY D.** | : | |
| **MARTIN, and BRUCE NOLOP,** | : | |
| **Defendants.** | : | **March 23, 2013** |

<u>**MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION TO DISMISS**</u>
<u>**SECOND AMENDED COMPLAINT [Dkt. 68]**</u>

I.    <u>**Introduction**</u>

Lead Plaintiff Labourers' Pension Fund of Central and Eastern Canada

("Plaintiff"), brings this action individually and on behalf of all others similarly

situated against Defendants Pitney Bowes Inc. ("Pitney Bowes" or "Pitney"),

Murray D. Martin ("Martin"), and Bruce Nolop ("Nolop") alleging violations of

sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act" or the "Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder,

and occurring between July 30, 2007 and October 29, 2007 (the "Class Period").

Plaintiff styles this as a fraud on the market action brought on behalf of all those

who purchased Pitney's common stock during the Class Period.  Defendants

have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a

claim upon which relief may be granted and for failure to plead fraud with

specificity as required under Fed. R. Civ. P. 9(b) and the Private Securities

1

Litigation Reform Act ("PSLRA").  For the reasons that follow, Defendants' Motion to Dismiss is GRANTED.

## II.    Factual Background

The following facts and allegations are taken from Plaintiff's Second Amended Class Action Complaint (the "Complaint") [Dkt. #66] and from the public documents and filings (including those with the Securities Exchange Commission ("SEC")), which Plaintiff references and on which Plaintiff relies.

Defendant Pitney Bowes is a multinational corporation headquartered in Stamford, CT and was, in 2006, the "largest provider of mail processing equipment and integrated mail solutions in the world."   [Dkt. 70-1, 2006 10-K pp.3, 7].  In 2007, Pitney had approximately 35,000 employees, was comprised of seven business segments and, in 2006, had over 300 facilities either leased or owned throughout the U.S. and other countries.  [Dkt. 70-2, Citigroup Tech. Conf. transcript p.1; Dkt. 70-5, 10-Q p.12; Dkt. 70-1, 2006 10-K p.7].  Pitney reported some 2 million customers worldwide, and revenue of a little less than $6 billion for 2006.  [Dkt. 70-2, Citigroup Tech. Conf. transcript p.1; Dkt. 70-1, 2006 10-K p.11].  The company provides mail processing equipment and integrated mail solutions in the United States and abroad, produces postage meters, offers mailing equipment and document and mailing services, and provides financing for office equipment purchases and facilities management services.  [Dkt. 66, Compl. ¶ 23].  Pitney is comprised of two large business groups: Mailstream Solutions and Mailstream Services.  [Dkt. 70-5, 10-Q p.6].  Mailstream Solutions

includes four business segments: (1) U.S. Mailing, (2) International Mailing, (3) Production Mail, and (4) Software.  [Dkt. 70-5, 10-Q p.12].  U.S. Mailing "[i]ncludes the U.S. revenue and related expenses from the sale, rental and financing of our mail finishing, mail creation, shipping equipment and software; supplies, support and other professional services; and payment solutions."  [Dkt. 70-5, 10-Q p.12].  The International Mailing segment offers substantially similar products and services to the company's overseas customers.  [*Id.*].  Business group Mailstream Solutions is comprised of the Management Services segment, the Mail Services segment, and the Marketing Services segment.  [*Id.*].  Management Services "[i]ncludes [Pitney's] worldwide facilities management services, secure mail services, reprographic, document management services; and litigation support services and eDiscovery services."  [*Id.*].  Defendant Murray Martin served as President and Chief Executive Officer of Pitney during the Class Period, and Defendant Bruce Nolop served as its Chief Financial Officer and Executive Vice President.  [Dkt. 66, Compl. ¶ 8].

For twenty-eight quarters prior to the Class Period, Pitney Bowes had met earnings expectations.  [*Id.* at ¶ 24].  Plaintiff alleges that by the start of the Class Period, however, Pitney's business "was suffering from a host of undisclosed adverse factors which were causing the Company to experience declining financial results and declining growth," which caused a shift in the company's business and prospects so significant that "the Company has still not recovered years after the end of the Class Period."  [*Id.* at ¶¶ 24, 28].

3

Plaintiff alleges that Pitney was aware of and chose not to disclose five problem areas plaguing the company by the start of the Class Period.  First, Plaintiff contends that revenues in Pitney's U.S. Mailing segment had declined dramatically by the start of the Class Period and the segment was not performing to internal expectations, due in part to a slowing of customers' migration from older analog mail meters to new digital meters, the deadline for which the Postal Service had set for after the Class Period.  [Dkt. 66, Compl. ¶¶ 30, 32].  However, Plaintiff contends that the old postal meters did not become obsolete upon this deadline, so customers "either delayed upgrading equipment or added components to existing equipment in order to comply with mailing regulations" instead of switching to the digital meters.[1]  [*Id.* at ¶¶ 30-31].  Plaintiff alleges that Pitney attempted during the Class Period to switch customers to the new digital meters often by means of "high pressured and misleading sales tactics," including erroneously representing to customers that the old meters must be switched to the new digital meters.  [*Id.* at ¶ 32].  Plaintiff further contends that *some* customers informed Pitney that they believed they were misled about the need to upgrade their analog machines and *many* of these then attempted to cancel.  [*Id.* at ¶¶ 32, 33].  Customers also allegedly became upset when they were forced to enter into new contracts with Pitney in connection with their migration

---

[1] Plaintiff does not enunciate when the deadline for this switch was to occur or whether customers were required by the new Postal Service regulations to switch to digital meters at all.  The Complaint is unclear as to whether customers were allowed by the regulations to continue using the old analog meters – with modifications – indefinitely, or whether customers chose to do so until the deadline set by the Postal Service, at which time they were required to purchase digital meters.

to the new digital machines.  [*Id.* at ¶ 33].  Despite these problems, Plaintiff alleges that prior to and during the Class Period Pitney represented customer migration from traditional analog postal meters to new digital postal meters as an area of growth.  [*Id.* at ¶ 31].

Second, Plaintiff claims that Pitney's failure to offer innovative products and services to its customers left Pitney vulnerable to intense competition.  [*Id.* at 36].  Plaintiff contends that prior to the Class Period Pitney cut back on its research and development budget, resulting in this failure.[2]  [*Id.* at ¶34].  During the Class Period, Pitney allegedly lost "a substantial amount of sales" to NeoPost Group, a direct competitor, and to various internet competitors and the U.S. Postal Service.  [*Id.* at ¶ 36].  Plaintiff further contends that a May 2007 Postal Service rate change (based in part on the shape of letters and packages and referred to herein as the postal rate case) was a factor in the decline of new equipment sales, as customers instead bought add-ons to existing equipment from March to May, 2007 and declined to purchase new equipment thereafter.  [*Id.* at ¶ 35].  Plaintiff alleges that Pitney's sales representatives "were so concentrated on selling the expensive add-ons that they did nothing for the rest of the year."  [*Id.* at ¶ 35].

Third, Pitney failed to meet internal sales projections prior to the Class Period and each month during the Class Period, which Plaintiff contends "was due to widespread problems experienced domestically and internationally and

---

[2] Plaintiff does not specify what the breadth of the research and development budget was, when it was cut, by how much it was cut, or what development projects were cut short by a lack of funds.

across various business segments involving large and small customers." [Dkt. 66, Compl. ¶¶ 37, 39]. These problems included (1) reduced sales in the Document Messaging division "by the start of the Class Period" due to large customers canceling, delaying, or failing to place orders; (2) the failure of Pitney's international operations to meet internal expectations by the start of the Class Period due to market liberalization and deregulation (including a change in the method of meter rentals in France and a mail strike in the United Kingdom),[3] which caused customers to delay purchasing decisions; (3) a "slowdown in sales, lack of sales, or cancellations from [] major customers" in the financial services sector by the start of the Class Period; and (4) a slowdown in new equipment sales to Countrywide Financial, "a critical account" in the San Bernardino district, due to the subprime lending crisis.[4] [Id. at ¶¶ 40, 41, 43, 44]. Plaintiff also contends that Pitney's International Mail Services division held an annual meeting in July, 2007, led by Pitney's Vice President of Sales and at which approximately forty sales representatives were present, and in which "managers announced that sales were down, that the Company was not meeting its internal

---

[3] Plaintiff does not specify when either of these two events occurred, other than "by the start of the Class Period," or when Pitney learned of these events. Further, Plaintiff does not allege that any of the named defendants either was or should, in the exercise of due diligence been, personally aware of these developments; nor does it state their order of magnitude either in general or relative to the company as a whole.

[4] Plaintiff does not specify when the slowdown in sales to Countrywide took place or how this slowdown affected company-wide sales.

expectations and that its sales representatives should do more to meet internal forecasts."[5]  [*Id.* at ¶ 42].

Plaintiff alleges that Pitney kept close track of sales during the Class Period in its "various divisions through monthly trend reports and internal sales reports," and that Defendants were thus aware of Pitney's poor financial performance.  [Dkt. 66, Compl. ¶ 37].  Plaintiff contends that Pitney's "internal forecasts were multifaceted and were comprised of both top-down and bottom-up components," adjustments to which were made several times per month after data of actual sales was compared to the forecasts.  [*Id.* at ¶ 38].  Pitney performed "a micro-level analysis of the number of orders transacted per day compared with the same periods in the prior year and in multiple prior years" to achieve a bottom-up forecast, which then formed the basis for the top-down forecast.  [*Id.* at ¶38].

Fourth, Plaintiff alleges that Pitney's customers "had become increasingly dissatisfied with the services provided by the Company prior to and during the Class Period," as a result of several factors, including (a) billing errors and inconsistencies due to an attempt by the company "around 2006 . . . to consolidate its billing systems"; (b) sales personnel using false and misleading

---

[5] Plaintiff does not specify how many sales representatives Pitney employs in total or in its International Mail Services division.  Nor does Plaintiff explain how reduced sales in the International Mail Services division correspond to reduced sales in the Document Messaging division or a slowdown in sales to the financial services sector or to Countrywide Financial.   Plaintiff also fails to note what percentage of Pitney's business the International Mail Services division comprised, or what percentages of all sales were made up by the other divisions within the company.

tactics to close sales, "such as pushing migration to digital meters when it was not required and promising free toner with an order," and not allowing customers to carry over to the next month any unused postage balance, all of which resulted in customers overpaying for services; and (c) sales personnel entering into "contracts at the end of financial quarters with customers that were certain to result in billing errors and nonpayments in order to generate new business," including forging customers' signatures for "very expensive equipment in order to make sales." [Dkt. 66, Compl. ¶¶ 45-47].

Fifth and last, Plaintiff contends that Pitney engaged in a pattern and practice of making it difficult for customers to cancel their accounts by requiring customers "to cancel contracts in writing and creat[ing] artificial obstacles to delay or hamper cancellations." [Dkt. 66, Compl. ¶ 48]. Plaintiff alleges that Pitney "shut off its fax machines at the end of the business day so that any faxed cancellation would not be received and would have to be subsequently re-faxed," delaying cancellation for unaware customers, sometimes for months. [*Id.* at ¶ 48]. After Pitney received a cancellation request the account was first referred to a retention group. This group attempted to convince the customer to continue with Pitney, but because the group was understaffed, customers were often forced to wait months to cancel, and were permitted to pay contract fees discounted by 10-40 percent if they remained as customers. [*Id.* at ¶ 49]. Plaintiff also contends that the delay in cancellations was caused partially by contract terms that prevented outright cancellation or that contained buyout provisions. [*Id.* at ¶51]. Plaintiff posits that "customers often attempted to cancel before the

permitted time by sending back their machines and ceasing to pay," which resulted in a dispute between Pitney and the customer.  [*Id.* at ¶52].

This allegedly deficient cancellation process resulted in "an undisclosed backlog of cancellations, contract re-negotiations and reduced fees for Pitney Bowes" prior to and during the Class Period, thus leading to lower revenue for the company.  [*Id.* at ¶53].  The "large reduction in fees, along with a lack of new business, began to materialize during the Class Period and continued after the end of the Class Period."  [*Id.*].  Plaintiff alleges that customer cancellation and retention metrics, including losses, were closely tracked by Pitney "through spreadsheets and electronic databases" and "forwarded up the corporate ladder on a weekly basis."  [*Id.*].

In support of its theory that Defendants were aware of the foregoing five problem areas, Plaintiff cites information gleaned from several confidential witnesses.  According to Confidential Witness ("CW") 1, a regional sales representative in Pitney's International Mail segment from 2004 to the third quarter of 2007, and CW10, a Pitney sales and retention employee from 2006 to 2008 who "dealt directly with customers that sought to cancel their contracts . . . and attempted to convince customers to remain with Pitney," the "Defendants tracked sales in the Company's various divisions through monthly trend reports and, therefore, were aware of the Company's declining revenue."  [Dkt. 66, Compl. ¶¶22, 79].  Per CW12, a business and financial planner in the Document Messaging Technologies division from 2006 to 2010 who "tracked sales and business in Document Messaging and regularly participated in weekly revenue

9

meetings during which the status of sales was disclosed," Pitney closely monitored sales and revenues compared to projections and "spreadsheets were disseminated throughout Pitney Bowes that tracked sales numbers compared to sales goals on a salesperson by salesperson basis and these spreadsheets showed that internal goals were not being met."[6]  [*Id.* at ¶¶22, 79].  According to CW10, Pitney "knew that sales numbers would be disappointing during the Class Period and that the Company's Spokane facility had sales below estimates prior to and during the Class Period."[7]  [*Id.* at ¶ 79].

According to CW12, sales were reviewed by individuals (no identities disclosed) on a daily basis and revenue meetings took place on a daily basis "when needed."  [Dkt. 66, Compl. ¶ 80].  Further, the Document Messaging division "had suffered numerous business setbacks prior to and during the Class Period, including loss of customers, disappointing sales, and cancellations."[8]  [*Id.*].  CW12 understood that senior managers in Document Messaging knew about the problems with the division during the Class Period.  [*Id.*].

CW13, the head of Sales Operations and Finance for Pitney from 2001 to 2010 and also the Vice President of Channel Management, was responsible for

---

[6] Plaintiff does not specify whether internal goals were not being met only during the Class Period or in the months preceding the Class Period also.  It is also unclear of whether the CW's knowledge is confined to projections within the Document Messaging Division.
[7] Plaintiff does not elaborate as to what impact the Spokane facility had on Pitney's business as a whole, or what percentage of Pitney's business was made up by the Spokane facility.
[8] Plaintiff does not specify for how long a period prior to the Class Period the Document Messaging division suffered such "setbacks."  Plaintiff also does not allege during what period or for how long a period revenue meetings took place on a daily basis.

forecasting sales for postal meters during the Class Period and ran the sales operations for Pitney's postal meter business.  [Dkt. 66, Compl. ¶ 22].  CW13 contends that Defendants Martin and Nolop "were integrally involved with reviewing the Company's consolidated forecasts and actual sales results on a regular basis."  [*Id.* at ¶ 81].  Per CW13, all forecasts from the various business divisions "rolled up through finance under Defendant Nolop," and were then reviewed by Martin.  CW13 posits that "it was recognized internally at Pitney Bowes by the start of the Class Period that mail volumes overall were softening and that competitors were having a negative impact on the Company's business." [*Id.*].  Per CW13, managers in the Postal Meter division regularly discussed that missed sales projections would negatively impact Pitney's stock price.[9]  [*Id.* at ¶ 82].

On or about September 6, 2007, Pitney issued $500 million in debt securities to investors.  [Dkt. 66, Compl. ¶ 83].

a.  <u>Allegedly False and Misleading Statements Made During the Class Period</u>

Plaintiff alleges that Pitney made numerous statements on six occasions during the Class Period that were materially false and misleading when made

---

[9] **Although CW13 was responsible for forecasting sales of postal meters, there is no allegation in the Complaint either that CW13's forecasts were not incorporated in Pitney's sales projections, or that CW13's forecasts were fabricated or inaccurate in any way. Nor is there any claim that the nemed defendants received or were otherwise aware of CW12's forcasrs.**

because they failed to disclose and/or misrepresented some of the problems

enumerated above.

### i.  First Occasion: July 30, 2007 Press Release

On July 30, 2007 (the start of the Class Period), Pitney announced its

financial results for the second quarter ending June 30, 2007 by way of a press

release which provided in its "Outlook" section, in part, the following:

> The company anticipates third quarter revenue growth
> in the range of 8 percent to 11 percent and revenue
> growth in the range of 7 percent to 10 percent for the full
> year.
>
> The company expects earnings per share from
> continuing operations on a GAAP basis in the range of
> $0.68 to $0.72 for the third quarter and $2.85 to $2.93 for
> the full year.  Excluding the effect of the accounting
> alignment for MapInfo, the company expects adjusted
> earnings per share from continuing operations in the
> range of $0.70 to $0.74 for the third quarter and
> continues to expect $2.90 to $2.98 for the full year.

[Dkt. 66, Compl. ¶ 54; Dkt. 70-3, 7/30/07 Press Release at p.3].  Defendant Martin

(President and CEO of Pitney) commented in the release, in part, as follows:

> We are pleased with our strong second quarter
> performance which underscores our ability to deliver
> value to shareholders and customers.  This quarter's
> results were led by the U.S. Mailing, Software and Mail
> Services segments.  The U.S. Mailing segment benefited
> from sales of equipment that help customers comply
> with the provisions of the recently-enacted U.S. postal
> rate case, which require that postage be based on shape
> as well as weight.  Our expanding Software business
> and our Mail Services operations also had excellent
> results in the quarter.  Lower equipment sales in
> Europe, as well as weak performance in the legal
> solutions portion of our Management Services segment,
> partially offset these positive results.  We have put in

> place marketing programs in Europe that we believe will
> improve the performance for the remainder of the year.
> At Management Services we had excellent new written
> business and we are realigning our legal solutions
> management and operations, which we expect will
> improve revenue growth and EBIT margins for the
> remainder of the year.

**[Dkt. 66, Compl. ¶ 54; Dkt. 70-3, 7/30/07 Press Release p.1].**

Plaintiff alleges that each and every one of the statements made in the release was materially false and misleading when made, because they failed to disclose and/or misrepresented the following adverse facts known to or recklessly disregarded by Defendants: (a) Pitney "was experiencing a slowdown in sales of equipment and software and supplies to the financial services sector; (b) revenues in the [] U.S. Mailing segment had dramatically declined and were not performing according to internal expectations;" (c) Pitney's international operations were not performing in line with internal expectations "as market liberalization and deregulation were causing customers to delay purchasing decisions;" (d) customers were increasingly dissatisfied with Pitney and many sought to cancel their contracts; and (e) "there was a large backlog of a reduction in fees due to Pitney [] as a result of delays in contract cancellations or customer retentions through re-negotiated fees."  [Dkt. 66, Compl. ¶ 55].  Thus, Plaintiff argues, "there was no reasonable basis for Defendants' positive statements about the Company, its operations, earnings, and outlook."  [*Id.*].

### ii.  Second Occasion: July 30, 2007 Conference Call

After the close of the markets on July 30, 2007, Pitney held a conference call with analysts and investors to discuss earnings and operations.  [Dkt. 66,

Compl. ¶ 56].  Plaintiff alleges that during the call Defendant Martin "spoke

positively about the Company's business, but failed to disclose the significant

problems then facing the Company."  [*Id.*].  Martin stated, in part:

> <u>We're comfortable with our guidance, and we will
> continue to make progress against our long-term goals
> for the balance of the year</u>.  We expect software and mail
> services to continue leading our growth, and U.S.
> production mail to continue benefiting from strong
> equipment placements.[10]
>
> In U.S. Mailing as we previously stated we expect to
> experience a normalized volume of activity for the full
> year.  This segment's growth will be supported by
> placements of digital mailing systems and mail creation
> equipment and continued increasing demand for our
> supplies and our payment solutions.  While <u>we expect
> improving trends for the balance of the year</u>, we are also
> taking actions to enhance the long-term value of our
> marketing services and our management services
> business.  In marketing services we are broadening our
> customer relationships to lessen the business impact
> caused by a single program or a single client.
> Additionally, we anticipate growth in management

---

[10] Plaintiff has excerpted Martin's remarks.  The full text of the paragraph in which
this statement appears reads:

> Although we expect to continue facing difficult
> comparisons for the balance of the year, we have put in
> place marketing programs to improve performance, and
> we're continuing to invest and position ourselves for the
> long term.  As Bruce [Nolop] noted, we experienced very
> strong growth in Asia which we see as an area for
> continued long-term growth opportunities.  We are
> actively preparing to take advantage of new
> opportunities as the international markets continue to
> evolve, and this is one of the driving forces behind the
> expansion of our software business.  <u>We're comfortable
> with our guidance, and we will continue to make
> progress against our long-term goals for the balance of
> the year. We expect software and mail services to
> continue leading our growth, and U.S. production mail to
> continue benefiting from strong equipment placements</u>.

[Dkt. 70-4, 7/30/07 Conf. Call Transcript p.3].

> services during the second half of the year as a result of the high volume of new business that was written this quarter, our <u>excellent customer retention</u>, and the benefits from the realignment of our legal solutions operation.  In closing let me reiterate my confidence in our underlying business momentum.  We had a good quarter.  We're on track for the year.  Our strategies are working, and we're focused on our priorities for delivering long-term shareholder and customer value. Now we'd be happy to take your questions.

[*Id.*; Dkt. 70-4, 7/30/07 Conf. Call Transcript p.3].

Plaintiff alleges that every statement Martin made  was materially false and misleading when made, for the same reasons as enumerated for Statement 1 (as set forth in ¶ 55 of the Complaint),[11] thus giving Martin no reasonable basis for his positive statements about the company, its operations, earnings, or outlook. [Dkt. 66, Compl. ¶¶ 55, 57].

Furthermore, Plaintiff alleges that the following portions of the above statement – underlined above – were materially false and misleading when made, because Defendants knew, or recklessly disregarded, that Pitney was not meeting internal sales goals or making progress against its long-term goals:

---

[11] The reasons stated are that: (a) Pitney "was experiencing a slowdown in sales of equipment and software and supplies to the financial services sector; (b) revenues in the [] U.S. Mailing segment had dramatically declined and were not performing according to internal expectations;" (c) Pitney's international operations were not performing in line with internal expectations "as market liberalization and deregulation were causing customers to delay purchasing decisions;" (d) customers were increasingly dissatisfied with Pitney and many sought to cancel their contracts; and (e) "there was a large backlog of a reduction in fees due to Pitney [] as a result of delays in contract cancellations or customer retentions through re-negotiated fees."  [Dkt. 66, Compl. ¶ 55].

- "[w]e're comfortable with our guidance, and we will continue to make progress against our long-term goals for the balance of the year"; and

- "we expect improving trends for the balance of the year."

[*Id.* at ¶ 57]. Lastly, Plaintiff alleges that Martin's claim of Pitney's "excellent customer retention" was false and misleading when made because Defendants knew or recklessly disregarded that "a large number of . . . customers were dissatisfied and sought to cancel their contracts." [*Id.* at ¶ 57].

### iii. Third Occasion: July 30, 2007 Conference Call Q & A

During the July 30, 2007 conference call, Defendant Martin engaged in a question and answer session, which included the following colloquy:

> JULIO QUINTEROS [Goldman Sachs analyst]: Got it. That's where the adjustment –– perfect.  As you look at the segment here where we had the pressure on the European operation offset by the U.S. segments, so when I am looking at the Mailstream Solutions – the Solutions business, especially related to the comments you made about expecting the U.S. Mailing piece to sort of fall back down in the more normalized range in the second half of the year relative to international mailing, which is obviously under some pressure here, how can -- how comfortable are you guys as U.S. Mailing sort of decelerates to the normalized range and international picked up in the back half of the year, that those two would be able to balance each other out so that the continued pressure from international mailing doesn't actually cause some disruptions in the performance for you guys in the second half of the year?

> MURRAY MARTIN: As we look at it, the – we think that the two combined will be fine in the period.  We've looked very closely at what is transpiring in every country with deregulation in Europe and what the opportunities are here in the U.S.  <u>Our lease portfolio gets richer later in the year, so we are seeing that as</u>

16

**being able to stay within the range that we had projected all along.**

[Dkt. 66, Compl. ¶ 58; Dkt. 70-4, 7/30/07 Conf. Call Transcript p.5].

Plaintiff alleges that Martin "misrepresented the strength of the markets in the United States and Europe" and that Martin's entire response was materially false and misleading when made for the same reasons given for the earlier statements,[12] thus giving Martin no reasonable basis for his positive statements about the Company, its operations, earnings, or outlook.  [Dkt. 66, Compl. ¶¶ 58, 59].

In addition, Plaintiff contends that the comment (underlined in the statement above) that "[o]ur lease portfolio gets richer later in the year, so we are seeing that as being able to stay within the range that we had projected all along," was materially false and misleading because Defendants knew or recklessly disregarded that Pitney was not meeting internal sales projections and there was a backlog of undisclosed cancellations.  [*Id.* at ¶ 59].

### iv.  Fourth Occasion: July 30, 2007 Conference Call Q & A

The following colloquy regarding customer retentions involving Defendant Martin also took place during the question and answer session:

> LLOYD ZEITMAN: Murray [Martin], I believe you mentioned PBMS[13] had a good quarter in writing business, and I wonder if maybe you can add some color to that.  And also the margins that the new

---

[12]  *See supra*, footnote 11.
[13]  PBMS refers to Pitney Bowes Management Services.  *See* http://www.pb.com/Management-Services/About-PBMS.shtml.

business is expected to carry, should they be similar to what we've seen over the last year or so before this quarter, somewhere in the 7% to 8% range?

MURRAY MARTIN: Yes.  I am not sure what you meant by give you a little more color to it, but it was one of the strongest we've had in quite a few years to give you a little insight into what that is.  The margin is equal or better than our current trends.  So at the same time as we're seeing that, <u>we're seeing a lower cancellation rate</u>. <u>So our retention rate of our existing customers is also stronger than it has been</u> in [sic] the two together should give us a good look forward as we go out.  But we would expect to see the margin to go from where it is positively.

[Dkt. 66, Compl. ¶ 60; Dkt. 70-4, 7/30/07 Conf. Call Transcript at p.9].

Plaintiff alleges that the following portions of the above statement – also underlined above – were materially false and misleading when made because Pitney knew that "customers had become increasingly dissatisfied with Pitney Bowes, a large number of customers attempted to cancel their contracts, and [Pitney] had a large backlog of undisclosed cancellations that had not yet been processed due to long delays":

- "we're seeing a lower cancellation rate"; and

- "our retention rate of our existing customers is also stronger than it has been."

[Dkt. 66, Compl. ¶ 61].

### v.  Fifth Occasion: August 6, 2007 Form 10-Q

On August 6, 2007 Pitney filed with the SEC its Form 10-Q signed by Defendant Nolop, among others, for the quarter ending June 30, 2007.  [Dkt. 66,

Compl. ¶ 62].  The 10-Q contained the following statement, under the heading

"Outlook" and presented in the section entitled *Management's Discussion and*

*Analysis of Financial Condition and Results of Operation*:

> **We anticipate that we will experience solid financial results in 2007.**  We expect our mix of product sales to continue to change, with a greater percentage of revenue coming from diversified revenue streams associated with fully featured smaller systems and a smaller percentage from larger system sales.  In addition, we expect to expand our market presence in Mailstream Solutions and Mailstream Services and derive further synergies from our recent acquisitions. We will continue to remain focused on our productivity programs and to allocate capital in order to optimize our returns.  As part of the purchase accounting for MapInfo, we aligned MapInfo's accounting policies for software revenue recognition with ours.  Accordingly, certain software revenue that was previously recognized by MapInfo on a periodic basis will now be recognized over the life of the contract.  Including the effect of this accounting alignment, we expect the acquisition of MapInfo to reduce diluted earnings per share from continuing operations by approximately 5 cents in 2007.

[*Id.*; Dkt. 70-5, 10-Q p.19].

Plaintiff contends that the statement "[w]e anticipate that we will

experience solid financial results in 2007" (underlined in the statement above)

was materially false and misleading when made, as Defendants knew or

recklessly disregarded that Pitney's "financial results were not expected to be

'solid,' the Company was not meeting internal sales projections and there was a

large backlog of undisclosed customer cancellations and reduced fees."  [Dkt. 66,

Compl. ¶ 63].

### vi.  Sixth Occasion: September 4, 2007 Citigroup Conference

On September 4, 2007 Defendant Nolop presented an overview of Pitney at a Citigroup Technology Conference, during which Nolop stated, in part:

> If you look at our revenue base, it's a combination of not only equipment sales as we mentioned, but also of a large percentage of stream revenue.  And in general we say that 75%, three-quarters of our revenue is recurring and you can see that it's a large part of rentals and financing as well as services, and this is really important for our model and that's why we are known as a defensive stock.  It's because of this <u>recurring revenue stream</u>.  <u>We're quite predictable and we're quite consistent in our results</u>.
>
> In terms of our proposition for investors, we expect to grow our earnings per share at 8% to 10% per year and that we have a dividend yield of 3%, so putting those together, that gives us 11% to 13% expected return to our shareholders with of course the potential for upside if we can expand our price range multiple.
>
> . . . .
>
> <u>Our cash flow is very consistent year-over-year</u> and you can see that it's averaged over the last five years, $530 million of free cash flow, which is cash flow from operations less than capital expenditures.  And we expect that to grow in the year 2007 to between $550 million and $625 million, so you're going to see a growth in free cash flow above our averages and we expect that to continue to grow.

[Dkt. 66, Compl. ¶ 64; Dkt. 70-2, Citi. Tech. Conf. transcript pp.1-2].

Plaintiff alleges that the entirety of this statement was materially false and misleading for the same reasons as cited for the statements made on the prior three occasions.[14]  [Dkt. 66, Compl. ¶ 65].  In addition, the portions below (underlined in the statement above) were materially false and misleading when made because "Defendants knew, or recklessly disregarded, that Pitney "had

---

[14] *See supra*, footnote 11.

20

fundamentally changed from the past, Pitney Bowes was not hitting internal sales

targets, and there was a large backlog of cancellations":

- "recurring revenue stream";

- "we're quite predictable and we're quite consistent in our results"; and

- "[o]ur cash flow is very consistent year-over-year."

[*Id.* at ¶ 65].

b. Pitney's Risk Warnings

Pitney included various risk warnings with its press releases, SEC filings,

and conference calls.[15]  The July 30, 2007 press release contained the following

risk warning regarding forward-looking statements:

> The information contained in this document is as of
> June 30, 2007.  Quarterly results are preliminary and
> unaudited.  This document contains "forward-looking
> statements" about our expected future business and
> financial performance.  Pitney Bowes assumes no
> obligation to update any forward-looking statements
> contained in this document as a result of new
> information or future events or developments.  Words
> such as "estimate," "project," "plan," "believe,"
> "expect," "anticipate," "intend," and similar expressions
> may identify forward-looking statements.  For us
> forward-looking statements include, but are not limited
> to, statements about possible restructuring charges and
> our future guidance, including our expected revenue in
> the third quarter and full year 2007, and our expected
> diluted earnings per share for the third quarter and for
> the full year 2007.  Forward-looking statements involve
> risks and uncertainties that could cause actual results
> to differ materially from those projected.  These risks
> and uncertainties include, but are not limited to:

---

[15] Not all risk warnings are included in this Background section.  The Court will
discuss Defendants' risk warnings and cautionary language later in this opinion.

> negative developments in economic conditions,
> including adverse impacts on customer demand, timely
> development and acceptance of new products or
> gaining product approval; successful entry into new
> markets; changes in interest rates; and changes in
> postal regulations, as more fully outlined in the
> company's 2006 Form 10-K Annual Report filed with the
> Securities and Exchange Commission.  In addition, the
> forward-looking statements are subject to change based
> on the timing and specific terms of any announced
> acquisitions or dispositions.

[Dkt. 66, Compl. ¶ 75; Dkt. 70-3, 7/30/07 Press Release p.4].

During that day's conference call with investors and analysts (from which

the second, third, and fourth statements derive), Pitney's Vice President of

Internal Relations started the call by warning similarly that:

> The forward-looking statements contained in this
> presentation involve risks and uncertainties and are
> subject to change based on various important factors
> including: changes in international or national political
> or economic conditions, timely development and
> acceptance of new products, timing of potential
> acquisitions, mergers or restructuring, gaining product
> approval, successful entry into new markets, changes in
> interest rates, and changes in postal regulations as
> more fully outlined in the Company's Form 10K annual
> report filed with the Securities & Exchange Commission.

[Dkt. 66, Compl. ¶ 75; Dkt. 70-4, 7/30/07 Conf. Call Transcript p.1].

Pitney's Form 10-Q for the quarter ending June 30, 2007 (and from which

the fifth statement hails), contained a Forward-Looking Statements warning in the

section entitled Management's Discussion and Analysis of Financial Condition

and Results of Operations, which cautioned, in relevant part

> We want to caution readers that any forward-looking
> statements [within the meaning of the Act] in this Form

10-Q, other reports or press releases or made by our management involve risks and uncertainties which may change based on various important factors.  We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.  These forward-looking statements are those which talk about our or management's current expectations as to the future and include, but are not limited to, statements about the amounts, timing and results of possible restructuring charges and future earnings.  Words such as "estimate," "project," "plan," "believe," "expect," "anticipate," "intend," and similar expressions may identify such forward-looking statements.  Some of the factors which could cause future financial performance to differ materially from the expectations as expressed in any forward-looking statement made by or on our behalf include:

- Changes in international or national political conditions, including any terrorist attacks
- Negative developments in economic conditions, including adverse impacts on customer demands
- Changes in postal regulations
- Timely development and acceptance of new products
- Success in gaining product approval in new markets where regulatory approval is required
- Successful entry into new markets
- Mailers' utilization of alternative means of communication or competitors' products
- Our success at managing customer credit risk
- Our success at managing costs associated with our strategy of outsourcing functions and operations not central to our business
- Changes in interest rates
- Foreign currency fluctuations

[Dkt. 70-5, 10-Q p.29].  Pitney's 10-K for 2006 contained the same Forward-Looking Statements warning.  [Dkt. 70-1, 2006 10-K p.29].  Likewise, the 10-Q advised that there were "no material changes to the risk factors identified in the Annual Report on Form 10-K for the year ended December 31, 2006."  [Dkt. 70-5,

10-Q p.30].  The Court will discuss the specific risk warnings in Pitney's 10-K later in this opinion.

Plaintiff contends that Pitney's risk warnings were "false or misleading as a matter of current or historical fact and/or were not meaningful" because, among other things, they were vague, boilerplate and did not adequately warn of the true risks of investing" in Pitney, based on the problems allegedly known to the Defendants at the time.  [Dkt. 66, Compl. ¶¶ 74, 76].  Plaintiff notes also that (1) the risk warnings in Pitney's 2006 10-K (filed March 1, 2007) are the same as those provided in Pitney's 10-Q for the third quarter of 2007 (filed November 2007), after the end of the Class Period, and (2) the risk warnings in the July 30, 2007 press release are the same as those in Pitney's October 29, 2007 press release (discussed *infra*).  [*Id.* at ¶ 77].

### c.  Post Class Period Financial Results

On October 29, 2007 Pitney issued a press release announcing its financial results for the third quarter ending September 30, 2007, reporting adjusted diluted earnings per share of $0.63 from continuing operations, below Pitney's projected $0.70 to $0.74 per share, and earnings per diluted share from continuing operations on a GAAP basis of $0.58, below Pitney's projected $0.68 to $0.72 per share.  [Dkt. 66, Compl. ¶ 66].  Defendant Martin noted the following in regard to these results:

> Business conditions during the third quarter were much more challenging than we originally anticipated.  Our Software and Mail Services segments continued to have very strong results, but their performance was offset by

> weakness in our U.S. and International Mailing
> segments as well as in our Management Services
> segment.

Martin then acknowledged that Pitney's performance during the third quarter was

negatively affected by four factors:

> First, weakness in certain sectors of the economy, such
> as financial services, is resulting in lower sales of
> equipment and software as well as lower print and
> supplies volumes.

> Second, the postal rate case in the second quarter was a
> positive event for U.S. Mailing and helped generate
> significant incremental sales during that quarter.  It is
> now apparent, however, that more of those sales were
> shifted from what would have normally occurred in
> future quarters than we had originally anticipated.
> Additionally, the benefit from meter migration this
> quarter was less than we expected.

> Third, in International Mailing, delays in postal
> liberalization across Europe are creating a more difficult
> environment in the postal sector and are impacting
> customer purchases.  The EBIT margin for International
> Mailing was adversely impacted by both the lower
> revenue growth and greater than anticipated expenses
> associated with our outsourcing contracts for European
> back office operations.

> And finally, at Pitney Bowes Management Services, the
> benefit from the strong written business in prior
> quarters was offset by continuation of weak results in
> legal solutions and delays in government outsourcing
> contracts.

[Dkt. 66, Compl. ¶ 66; Dkt. 70-6 10/29/07 Press Release p.1].

During a conference call with analysts and investors after the close of

markets that day, Martin remarked that "[t]his is the first time in 28 quarters that

we have performed below earnings expectations."  [Dkt. 66, Compl. ¶ 67].  He

then detailed the four factors that caused Pitney to miss its earnings

expectations: (1) an unfavorable impact on sales and transactions volumes due to weakness in the economy, particularly in financial services; (2) lower than expected revenue in U.S. Mailing due to the wind down of meter migration and the spillover effect of the rate case; (3) delays in market liberalization and deregulation internationally, contributing to "market confusion and lower product placements," including that, for example, "strike conditions at Royal Mail [in the U.K.] created uncertainty affecting postal services and reducing sales," and, in France, "a regulatory change in the method of meter rentals is causing both delayed purchasing decisions and increased selling and marketing costs;" and, finally, (4) in Management Services, weak performance in the legal solutions vertical and "unanticipated delays in new business in the government solutions vertical as the postal service postponed any additional outsourcing activity while it works through the review of the new regulations that resulted from postal reform."  [Dkt. 66, Compl. ¶ 67; Dkt. 70-7 10/29/07 Conf. Call Transcript p.2].

The value of Pitney's common stock dropped fifteen percent on October 30, 2007, from $46.99 to $39.93 per share, which Plaintiff alleges was in response to Pitney's announcements.  [Dkt. 66, Compl. ¶ 68.  Plaintiff further contends that as a result of Pitney's allegedly false and misleading statements and failures to disclose material facts, Pitney's common stock traded at artificially inflated prices during the Class Period, thus "creat[ing] in the market an unrealistically positive assessment of Pitney Bowes and its business, prospects and operations."  [*Id.* at ¶¶ 71-73].

III.    **Discussion**

a. __Legal Standard__

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' "  *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (internal citations omitted).  In a securities fraud action, " 'courts must consider the complaint in its entirety,' assessing 'whether *all* of the facts alleged, taken collectively, give rise' to the required inferences."  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 12-1776-CV, 2012 WL 6621391 (2d Cir. Dec. 20, 2012) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)).  Courts may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon

which it relied in bringing the suit." *Kleinman v. Elan Corp., plc*, 706 F.3d 145 (2d Cir. 2013) (internal citation omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

Additionally, a complaint alleging violations of § 10(b) and Rule 10b-5 must meet the heightened pleading standard of Fed. R. Civ. P. 9(b) and the rules prescribed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See Tellabs*, 551 U.S. at 321. Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this requirement the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted). Under the PSLRA, the

28

complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . shall state with particularity all facts on which that belief is formed;" and (2) plead facts "giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1)(B), (b)(2)(A).  *See Tellabs,* 551 U.S. at 321; *Kleinman*, 706 F.3d 145.

### b.  Section 10(b) of the Exchange Act

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the SEC to implement this portion of the Exchange Act, makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).

"In order to succeed on a [10(b)] claim, a plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."  *ECA,*

*Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks and citations omitted); *see also Kleinman*, 706 F.3d 145 ("For a violation of Section 10(b) and Rule 10b–5, a plaintiff must plead a plausible claim . . . that includes the action's basic elements: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance ...; (5) economic loss; and (6) loss causation.") (internal citations and quotation marks omitted).

Defendants argue that Plaintiff has failed to plead fraud with particularity under Fed. R. Civ. P. 9(b) and the PSLRA as to the statements above for which Plaintiff has failed to identify the precise portions or sub-statements alleged to be false.  As to the embedded portions of these statements that Plaintiff specifically identifies as being false, Defendants proffer several reasons for dismissal:  (1) the statements at issue are forward-looking statements subject to meaningful, cautionary language given by Pitney, (2) the statements are expressions of corporate optimism that constitute inactionable puffery, and (3) Plaintiff has failed to plead particularized facts to create a compelling inference of scienter or to allege that the statements were false when made.  The Court finds that Plaintiff's Complaint lacks the specificity required under the PSLRA and Rule 9(b), and that Plaintiff has failed to allege a compelling inference of scienter.  Scienter is an essential element of a securities fraud claim that renders an action unmaintainable if not pled.  *Tellabs*, 551 U.S. at 319 ("To establish liability under §

10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter").

Because the issue of scienter can only be properly analyzed in the context of the statements made, the Court will first address several of Defendants' other arguments in favor of dismissal of Plaintiff's Complaint.

### c.  Forward-Looking Statements Subject to Safe Harbor

Defendants assert that they are entitled to safe harbor protection under the PSLRA and protection under the "bespeaks caution" doctrine for the allegedly fraudulent statements because each is either forward-looking or is an "embedded assumption within forward-looking predictions," and is accompanied by meaningful cautionary language.  [Dkt. 69, Ds' MTD at pp. 14-15].  Plaintiff counters that (1) many of the statements are not forward-looking statements, but rather statements of past or present fact, (2) any cautionary language given was insufficient to invoke the safe harbor protection, and (3) Defendants made the statements at issue with actual knowledge that they were false or misleading (ie, Plaintiff has adequately pled scienter).

The PSLRA, which in 1995 amended the Exchange Act, established a safe harbor for statements that are "forward-looking" in nature.  The PSLRA provides that, in general,

> [i]n any private action . . . that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a [defendant] shall not be liable with respect to any

forward-looking statement, whether written or oral, if and to the extent that –

(A) the forward-looking statement is –

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement –

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was – (I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1)(A), (B).  The Second Circuit has summarized this language as follows: "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton*, 604 F.3d at 766.  Proof of scienter in accordance with the heightened pleading standards under the PSLRA is a required element in the actual knowledge prong of the statutory safe harbor.  *Slayton*, 604 F.3d at 766.  Additionally, for an oral forward-looking statement to be non-actionable, it must be accompanied by a cautionary statement (1) identifying the particular oral statement as forward-looking, (2) stating that the "actual results might differ materially from those projected in the forward-looking statement," and (3)

identifying a readily available written document or portion thereof that identifies factors that "could cause actual results to materially differ from those in the forward-looking statement."  15 U.S.C. § 78u–5(c)(2).  *See also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004).

The PSLRA defines forward-looking statements to include, among others, statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," statements "of the plans and objectives of management for future operations," statements "of future economic performance," including those in the management's discussion and analysis of financial condition section of an SEC filing, and "any statement of the assumptions underlying or relating to any" such statements.  15 U.S.C. § 78u–5(i)(1).  Although a forward-looking statement must be identified as such, "[n]othing in the [PSLRA] indicates that to be adequately identified, a forward-looking statement must be contained in a separate section or specifically labeled [as forward-looking]."  *Slayton*, 604 F.3d at 769.  In this Circuit, "the facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified as forward-looking," and the "use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement."  *Id.* (internal

quotation marks omitted).  *See also Gissin v. Endres*, 739 F. Supp. 2d 488, 507 (S.D.N.Y. 2010) (summarizing same).

The safe harbor, however, applies only to forward-looking statements and not to statements of historical or present fact.  *Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 264 (2d Cir. 2010); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 568 (S.D.N.Y. 2011) ("[T]he safe harbor . . . do[es] not apply to statements of present or historical facts.").

As an initial matter, several of the statements alleged to be false or misleading are forward-looking as defined by the PSLRA.  Pitney's revenue growth and expected earnings predictions in the "Outlook" section of the July 30 press release are plainly forward-looking as they project the company's future revenues and financial performance for the third quarter of 2007.  The statements incorporate the requisite "linguistic cues" denoting forward-looking statements: "the company *anticipates*" and "the company *expects*."  Furthermore, the press release contains an express description of Pitney's intention to designate these projections as forward-looking.[16]

─────────────────

[16] The press release states, in relevant part:

> This document contains 'forward-looking statements' about our expected future business and financial performance. . . . Words such as 'estimate,' 'project,' 'plan,' 'believe,' 'expect,' 'anticipate,' 'intend' and similar expressions may identify forward-looking statements. For us forward-looking statements include, but are not limited to, statements about . . . our future guidance, including our expected revenue in the third quarter and full year 2007, and our expected diluted earnings per share for the third quarter and for the full year 2007.

Likewise, Martin's statements during the July 30 conference call with investors that "we're comfortable with our guidance, and we will continue to make progress against our long-term goals for the balance of the year," and that "we expect improving trends for the balance of the year" are forward-looking. The statements contain the familiar linguistic cues ("we *expect*") and undeniably speak to anticipated future economic performance. The statements were also identified as forward-looking. Pitney's Vice President of Investor Relations began the conference call by explaining that Pitney's presentation regarding second quarter earnings would contain forward-looking statements, and further explaining that such statements involved risks and uncertainties and were subject to change based on factors which he then enumerated.

The statements Martin made during the conference call that "[o]ur lease portfolio gets richer later in the year, so we are seeing that as being able to stay within the range that we had projected all along," is also partially forward-looking partially, as the statement relies on a present fact to make a forward-looking prediction. Plaintiff argues that because this statement (as well as others) contains elements of present or historical fact that it believes to be misleading, the statement remains actionable. The Court agrees that statements that encompass both a forward-looking element and a statement of present or historical fact do not enjoy safe-harbor protection where the defendant had no basis for its optimistic future predictions as based on false or misleading representations of current or historical fact. *See Sawant v. Ramsey*, 3:07-CV-980

_____

[Dkt. 70-3, 7/30/07 Press Release p.4].

VLB, 2010 WL 3937403 (D. Conn. Sept. 28, 2010) (VLB) (holding that otherwise forward-looking statements that contain misrepresentations of current facts "are not protected by the safe harbor provision of the PSLRA or the bespeaks caution doctrine"); *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (holding that statements encompassing forward-looking and present or historical components were not entitled to safe harbor protection where the "[c]omplaint alleges that the Defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality" and notably where plaintiffs adequately pled scienter); *In re APAC Teleserv., Inc. Sec. Litig.*, 97 CIV. 9145 (BSJ), 1999 WL 1052004, at *8 (S.D.N.Y. Nov. 19, 1999) ("Linking future success to present and past performance does not render statements immune from liability" where plaintiffs sufficiently pled that statement of present fact failed to disclose material information, thus rendering forward-looking portion of statement false and misleading).

It is true that "[m]isrepresentation of present or historical facts cannot be cured by cautionary language," but the Plaintiff here has failed to posit that the present or historical fact in these statements was false, thus rendering the forward-looking portions of any statement false. *Authentidate*, 369 F. App'x at 264. Here, as will be discussed further *infra*, Plaintiff has failed to sufficiently plead either that the present fact contained in this statement – that Pitney's lease portfolio is richer later in the year – is false, *or* that Martin had actual knowledge of its falsity, *or* a strong nexus between the problem areas described in the Complaint and the losses suffered. Thus, the forward-looking portion of the

statement is severable and eligible for safe-harbor protection if accompanied by meaningful cautionary language.  The same conclusion holds true for each of the statements containing both forward-looking and present or historical elements.

Lastly, Pitney's statement that "[w]e anticipate that we will experience solid financial results in 2007"), contained in the MD&A section of Pitney's 10-Q, is forward-looking for the same reasons explained above, and was identified as such in the 10-Q which, as noted *supra*, specifically identified such statements as forward-looking.

Plaintiff posits that the cautionary language accompanying the above statements is insufficient to invoke safe harbor protection because it warned only of general risks and uncertainties and failed to warn investors of problems that had already come to pass.  This argument fails for two reasons: (1) as the Court will discuss later in this opinion, the Plaintiff has failed to adequately plead a nexus between the alleged problem areas it details in the Complaint and the allegedly fraudulent statements or the harms it suffered, and so has failed to adequately plead that any problem area had already come to pass at the time the statements were made, and (2) Pitney's cautionary language contained warnings about exactly the risks that Plaintiff claims caused its losses.  Therefore, each of the foregoing forward-looking statements is entitled to safe harbor protection under the PSLRA.

In order for cautionary language to be meaningful such that the safe harbor applies to a forward-looking statement, such warning must identify "important

factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i).  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."  *Slayton*, 604 F.3d at 772.  A company, however, "need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor."  *Id.* at 773; *see also In re Avon Products, Inc. Sec. Litig.*, 05 CIV.6803 LAK MHD, 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) (quoting substantially same), *report and recommendation adopted by In re Avon Products, Inc. Sec. Litig.*, 05 CIV. 06803LAK, 2009 WL 884687 (S.D.N.Y. Mar. 30, 2009).

Here, Plaintiff cites five purportedly adverse factors facing the company prior to and/or during the Class Period to which it attributes Pitney's unexpectedly poor third quarter financial results and of which it claims Defendants knew at the time they made the false and misleading statements: (a) Pitney "was experiencing a slowdown in sales of equipment and software and supplies to the financial services sector; (b) revenues in the [] U.S. Mailing segment had dramatically declined and were not performing according to internal expectations;" (c) Pitney's international operations were not performing in line with internal expectations "as market liberalization and deregulation were causing customers to delay purchasing decisions;" (d) customers were increasingly dissatisfied with Pitney and many sought to cancel their contracts;

and (e) "there was a large backlog of a reduction in fees due to Pitney [] as a result of delays in contract cancellations or customer retentions through re-negotiated fees."  [Dkt. 66, Compl. ¶ 55].  In the context of these problem areas, which have not been adequately pled in the Complaint such that the Court may infer that they existed before the Class Period or were known to the Defendants, the risk warnings accompanying the Defendants' statements do include the particular factor that ultimately caused its projections not to come true and also qualify Defendants for safe harbor protection.[17]

As noted previously, Pitney's July 30 press release contained a risk warning section which listed "negative developments in economic conditions, including adverse impacts on customer demand, timely development and acceptance of new products or gaining product approval; successful entry into new markets; changes in interest rates; and changes in postal regulations, as more fully outlined in the company's 2006 Form 10-K Annual Report filed with the Securities and Exchange Commission" as specific risks that could cause actual results to differ materially.  [Dkt. 70-3, 7/30/07 Press Release at p.4].

The July 30 press release was also peppered with warning language applicable to the areas with which Plaintiff takes issue.  For example, in

---

[17] As explained later in this opinion, the Court does not address the statements in their entireties as, generally, Plaintiff has failed to plead fraud with the requisite specificity.  The Court notes, however, that to the extent that these block quotes contain forward-looking statements, the adequacy of these risk warnings would likewise apply.  The risk warnings address the five problem areas Plaintiff has identified that allegedly caused Pitney's financial woes giving rise to this action. The Court does not posit an opinion as to whether these risk warnings would be sufficient were the allegations in the Complaint adequately pled.

discussing Pitney's U.S. Mailing segment, the company stated that the segment's results for the quarter "were favorably impacted by growth in supplies and payment solutions as well as sales of equipment related to shape-based pricing." In the very next sentence, though, Pitney warned that "[t]he company does not anticipate the benefits from shape-based pricing to continue for the remainder of the year.  Therefore, the company expects full year revenue growth in U.S. Mailing within a normalized range."  [Dkt. 70-3, 7/30/07 Press Release p.2].  Pitney expressed reservation about its International Mailing segment as well.  The company reported revenue growth of one percent for the quarter, but an EBIT decrease of 14 percent.  The Company explained that "International Mailing revenue growth benefited by about 5 percent from favorable currency translation, but was *adversely affected by lower equipment sales and rentals in Europe*.  The company's continued investments for growth in sales and marketing channels in Europe, as well as expenses related to the company's European back office operations, negatively impacted the segment's EBIT margin."  [Dkt. 70-3, 7/30/07 Press Release p.2].  Finally, Pitney noted an increase in revenue in its Management Services segment but a decline in EBIT for the quarter.  The company explained that revenue growth was assisted by acquisition and favorable currency translation, but was "adversely affected by non-recurring print contracts in the prior year."  The company then clarified that "[t]he decline in the segment's EBIT margin was due principally to continued investments for growth in sales and marketing channels, weakness in legal solutions, and the lower volume of offsite print contracts."  [Dkt. 70-3, 7/30/07 Press Release p.2].

Likewise, Pitney's 10-K specifically enumerated the risk posed by "Postal regulations and processes," warning that

> The majority of our revenue is directly or indirectly subject to regulation and oversight by the USPS and foreign postal authorities.  We also depend on a healthy postal sector in the geographic markets where we do business, which could be influenced positively or negatively by legislative or regulatory changes in the United States, another country or in the European Union.  Our profitability and revenue in a particular country could be affected as a result of adverse changes in postal regulations, the business processes and practices of individual posts, the decision of a post to enter into particular markets in direct competition with us, and the impact of any of these changes on postal competitors that do not use our products or services.  These changes could affect product specifications, service offerings, customer behavior and the overall mailing industry.

[Dkt. 66, Compl. ¶ 75; Dkt. 70-1, 2006 10-K p.5].  The risk entitled "Accelerated decline in use of physical mail" warned investors that

> Changes in our customers' communication behavior, including changes in communications technologies, could adversely impact our revenue and profitability.  Accelerated decline in physical mail could also result from government actions such as executive orders, legislation or regulations that either mandate electronic substitution, prohibit certain types of mailings, increase the difficulty of using information or materials in the mail, or impose higher taxes or fees in mailing or postal services.  While we have introduced various product and service offerings as alternatives to physical mail, *we face competition from existing and emerging products and services that offer alternative means of communication, such as email and electronic document transmission technologies*.  An accelerated increase in the acceptance of electronic delivery technologies or other displacement of physical mail could adversely affect our business.

[Dkt. 70-1, 2006 10-K p.5 (emphasis added)].

The 10-K described in detail the company's competition in its description of its business, stating:

> Our meter base and our *continued ability to place and finance meters in key markets is a significant contributor to our current and future revenue and profitability.* However, all of our segments face strong competition from a number of companies. *In particular, we face competition for new placements of mailing equipment from other postage meter and mailing machine suppliers, and our mailing products, services and software face competition from products and services offered as alternative means of message communications.* In addition, the financing business is highly competitive. Leasing companies, commercial finance companies, commercial banks and other financial institutions compete, in varying degrees, in the markets in which our finance operations do business. Our competitors range from very large, diversified financial institutions to many small, specialized firms.

[Dkt. 70-1, 2006 10-K p.4 (emphasis added)].

The Forward-Looking Statement section of the 10-K warned investors of factors "which could cause future financial performance to differ materially" from projections, including, among others "changes in international or national political conditions," "negative developments in economic conditions, including adverse impacts on customer demands," "changes in postal regulations," "success in gaining product approval in new markets where regulatory approval is required," "successful entry into new markets," "mailers' utilization of alternative means of communication or competitors' products," "success at managing customer credit risk," "changes in interest rates," and "foreign currency fluctuations."  [Dkt. 70-1, 2006 10-K p.29].

Pitney's 10-Q contained identical Forward-Looking Statement risk factors. [Dkt. 70-5, 10-Q p.29].  It also contained tempered language about the company's second quarter results (in the Management's Discussion and Analysis section, or "MD&A"), including that "[l]ower equipment sales in Europe, as well as weak performance in the legal solutions portion of our Management Services segment, partially offset" the positive results in the U.S. Mailing segment associated with sales of equipment geared toward compliance with the U.S. postal rate case requiring postage to be based on shape as well as weight.  [Dkt. 70-5, 10-Q at MD&A p.19].  The 10-Q also specifically reported that the company did "not anticipate the benefits from shape-based pricing to continue for the remainder of the year" and that although revenue benefited in the second quarter "from growth in supplies and payment solutions as our meter base continues to transition to new digital technology," "revenue continued to be adversely affected by the ongoing changing mix to more fully featured smaller systems."  [Dkt. 70-5, 10-Q p.20].

This cautionary language is more than adequate to fulfill the requirements for safe harbor protection.  Not only does it identify crucial areas of risk in Pitney's business, it specifically addresses the problem areas which Plaintiff alleges to be Pitney's downfall: weak economic conditions and adverse impacts on customer demands; customer transition to smaller systems; lower equipment sales in Europe; strong competition from postage meter and mailing equipment suppliers, those offering alternative means of communication, and foreign or domestic postal authorities; and foreign and domestic regulatory changes. A

company need not be prescient, it need only be aware of its  business environment and warn of factors and circumstances present in its business environment which could affect the company's results.  *See In re Avon,* 2009 WL 848017, at *17 ("although the warnings do not specifically reference the possibility that retailers in China might reduce purchases, such specificity is not required. The warning need only cite important factors and need not mention the particular factor that ultimately causes the forward-looking statement not to come true").

The challenged statements do not highlight the positive and omit the negative consequences which could result from the disclosed facts, but rather warn the reader of factors present in the business environment which could impede the company from achieving its goals and thereby place downward pressure on the company's prospects and results.  *See In re Sturm, Ruger & Co., Inc. Sec. Litig.*, 3:09-CV-1293 CFD, 2011 WL 494753, at *6 (D. Conn. Feb. 7, 2011) (applying safe harbor where cautionary language "cites to market demand and sales levels as two factors that may alter the company's projections, two of the same problems that plaintiffs allege hurt the company's profitability by the third quarter of 2007"); *accord In re Vivendi*, 765 F. Supp. 2d at 570-71 (announcement of EBITDA growth projection was not protected safe harbor where plaintiffs had adequately pled that defendant "failed to disclose as a matter of present fact that the company was not actually envisioning achieving anything close" to the target and where the "misleading nature of the statement could be verified the moment it was made, and did not depend on any future events.").

As to Defendants' oral forward-looking statements during the July 30 press conference, these too fall within the safe harbor.  The introduction to Pitney's presentation during the conference call – as described previously – specifically warned investors that certain risks and uncertainties "could cause actual results to differ materially from those projected" in the forward-looking statements.  The company laid out these risks at the beginning of the call with investors and directed investors that the risks were more fully outlined in Pitney's 2006 Form 10-K.  [Dkt. 70-4, 7/30/07 Conf. Call Transcript p.1].  *See In re Avon*, 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) (holding that 10-K was readily available written document for purposes of 15 U.S.C. § 78u-5(c)(2) and finding risks enumerated in 10-K adequate where risks included general economic and business conditions in the company's market, the company's ability to implement its business strategies and to identify new business opportunities, among other general risks).  The risks specifically enumerated were the same as those specified in Pitney's July 30 press release.  Martin and Nolop tempered the presentation with specific cautionary language.  Martin addressed the shape-based pricing / rate case issue, stating that "we do not expect the benefits from shape-based pricing to continue for the remainder of the year."  [Dkt. 70-4, 7/30/07 Conf. Call Transcript p.2].  Nolop echoed this sentiment: "our performance was led by three of our business segments.  First, the U.S. mailing segment achieved double-digit revenue growth for the first time in many years.  However, the stimulus from the recent postal rate case will not continue into the third and fourth quarters, therefore we expect the U.S. mailing segment will have normalized revenue growth for the full year."  [Dkt.

70-4, 7/30/07 Conf. Call Transcript p.2].  Martin further stated in response to a question posed by a caller that the revenues from this shape-based postal rate case had been "fully realized in the quarter."  [Dkt. 70-4, 7/30/07 Conf. Call Transcript p.6].  Martin explained the economic benefits of a switch from analog to digital postal meters as "more of a bubble in Q2 where there was accelerated revenue from kits that upgraded the machines rather than changing the equipment, and so people added features to their existing hardware, and that was a one-time positive, but the underlying market is basically staying the same."  Notably, the investor question that elicited this response acknowledged that Pitney had predicted a market slowdown in the third quarter: "Firstly on the U.S. Mailing, I just wondered, you seem *pretty of [sic] confident the market will slow down from Q2 in the second half of the year*.  Have you already seen that or is that something you expect to happen . . .?"  [Dkt. 70-4, 7/30/07 Conf. Call Transcript p.7 (emphasis added)].  Martin and Nolop also addressed weaker sales in rentals of mailing equipment in Europe, poor results in the "legal solution vertical market," difficulty in the European Document Messaging Technologies sector as a result of a slow market, and competition from sources such as NeoPost.  [Dkt. 70-4, 7/30/07 Conf. Call Transcript pp. 2, 5].  Further, Pitney specifically warned investors that it expected activity in its U.S. Mailing sector would be "normalized" for the full year, a warning that appears directly in the second allegedly false statement.  [Dkt. 70-4, 7/30/07 Conf. Call Transcript p. 3].  For the same reasons as previously discussed, these oral forward-looking

statements are entitled to the safe harbor in light of the foregoing cautionary language.

Plaintiff's assertion that the above cautionary language is boilerplate and must be disregarded because Pitney's 2005, 2006, and 2007 Forms 10-K and its 10-Q for the second quarter of 2007 contained substantially similar risk disclosures is unavailing.  Plaintiff has not demonstrated that the risk factors facing the company were not present in prior quarters.  Notably, Plaintiff readily admits that prior to the Class Period Pitney had met earnings expectations for twenty-eight quarters and the decline in Pitney's business was "dramatic and signaled a significant shift in the Company's business and prospects."  [Dkt. 66 Compl. ¶ 24].  Given the admitted relative stability of Pitney's business for 28 quarters, the Court cannot conclude, without the aid of adequately pled allegations that Defendants *knew* of the changing business risk, that Pitney's risk warnings were inadequate simply because they did not differ materially for three consecutive years.  *See Slayton*, 604 F.3d at 772-73 (cautionary language was not adequate for safe harbor protection where the "defendants' cautionary language remained the same even *while the problem changed*. . . . The consistency of the defendants' language over time *despite the new information they received* . . . belies any contention that the cautionary language was tailored to the specific future projection.") (emphasis added).  The third and operative Complaint does not allege that any particular defendant knew of and failed to disclose any particular fact which was not included in and which was necessary to make

Pitney's cautionary language not misleading or which made Pitney's cautionary language untrue.

Lastly, the Court briefly addresses Plaintiff's contention that these forward-looking statements do not enjoy safe harbor protection because the statements were made "with actual knowledge that they were false or misleading." [Dkt. 73, P's Opp. to MTD p.16]. Plaintiff, however, has failed to plead the required element of scienter, as discussed *infra*, or that the statements were false when made. Because Plaintiff has failed to proffer sufficient evidence that the Defendants had *actual* knowledge that the subject statements were false or misleading at the time they were made, and because the foregoing statements are forward-looking and accompanied by the requisite cautionary language (in the context of the pleadings), they are entitled to safe harbor protection and are inactionable. *See Slayton*, 604 F.3d at 773 ("The safe harbor provision also requires dismissal if the plaintiffs do not 'prove that the forward-looking statement ... was ... made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading.' To do so, the plaintiffs must state with particularity . . . the facts evidencing scienter.") (quoting 15 U.S.C. § 78u–5(c)(1)(B)).

The crux of Plaintiff's argument is that the cautionary language provided by Defendants did not adequately warn of specific problems that had already happened or begun to happen and of which some Pitney employees knew. However, as will be discussed, Plaintiff has failed to adequately allege either that these problem areas either existed at the time the statements were made or that

48

any Defendant had actual knowledge of any particular problem prior to the Class Period.  Thus, the portions of the statements made on occasions 1, 2, 3 and 5 discussed above are entitled to the statutory safe harbor for forward-looking statements accompanied by meaningful cautionary language.  They are therefore inactionable.

### d.  Insufficiency of the Pleadings

As noted prior, a complaint alleging violations of § 10(b) and Rule 10b-5 "must state with particularity the circumstances constituting fraud or mistake" under the heightened pleading standard of Rule 9(b).  Fed. R. Civ. P. 9(b).  "To satisfy this requirement the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted).  Additionally, under the PSLRA, the complaint must specify each statement alleged to have been misleading, the reasons why the statement is misleading, all facts on which such belief is formed, and facts giving rise to a strong inference of scienter.  15 U.S.C. § 78u-4(b)(1)(B), (b)(2)(A).

Finally, to state a claim under section 10(b) a plaintiff must "allege facts establishing the materiality of the misstatements and omissions."  *Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 264 (2d Cir. 2010).  "To fulfill the materiality requirement there must be a substantial likelihood that the statement or omission 'significantly altered the total mix of information made

available,' as viewed by the reasonable investor."  *Id.* at 264 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  "A complaint cannot be dismissed for lack of materiality unless the statements in question are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Authentidate*, 369 F. App'x at 264.  However, "[i]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145 (2d Cir. 2013) (citing *Matrixx Initiatives, Inc. v. Siracusano*, ––– U.S. ––––, 131 S. Ct. 1309, 1321 (2011)).  "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor. Disclosure is required only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading."  *Kleinman*, 706 F.3d 145 (internal quotation marks and citations omitted). Plaintiff's Complaint fails to meet these heightened pleading requirements.

Firstly, Plaintiff has identified several lengthy passages it alleges to be fraudulent, but has not, in all cases, narrowed down the passages to allege which portions are false or misleading.  Defendants argue that where Plaintiff alleges that an entire passage is false or misleading but fails to specify which particular statement in the passage is false, the Court should dismiss this action as to such statement for failure to plead fraud with particularity.  [Dkt. 69, Ds' MTD, at p. 11]. Plaintiff argues in response that the larger passages quoted contain statements which are virtually identical in substance to those statements that were

specifically identified, and thus there is no rational basis for distinguishing between these statements.  [Dkt. 73, P's Opp. to MTD, at pp. 12-15].

While it is true that the statements in their entirety do contain sub-statements that reiterate those which Plaintiff has specifically identified as being fraudulent, these block quotes also contain portions that do not obviously correspond to any of Plaintiff's purported five problem areas and that Plaintiff fails to explain.  Such pleading does not satisfy the particularity requirements of Rule 9(b) or of the PSLRA, as it fails to give Defendants adequate notice of the claims against them.  *See Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 570 (S.D.N.Y. 2009) ("although plaintiff's Complaint quotes verbatim from a series of press releases and other statements allegedly made by defendants during the Class Period, it fails to identify which portions of these statements (if any) were false or misleading.  On this basis alone, plaintiff's Complaint must be dismissed, because it fails to afford defendant [s] fair notice of the plaintiff's claim and the factual ground upon which it is based."); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 12-1776-CV, 2012 WL 6621391, at *4 (2d Cir. Dec. 20, 2012) (dismissing complaint for failure to meet pleading standard where court would be forced "to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter."); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) ("Plaintiffs list various statements-often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts-then follow each

with a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false.  Plaintiffs neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards."); *In re Sina Corp. Sec. Litig.*, 05 CIV. 2154(NRB), 2006 WL 2742048, at *6 (S.D.N.Y. Sept. 26, 2006) (complaint failed to satisfy pleading requirements where it set forth "large block quotes taken from public statements made by the Individual Defendants and from SEC filings, followed by generalized explanations of why the statements collectively misled the plaintiffs").

Furthermore, the Complaint fails to provide an adequate nexus between the alleged problem areas and the harms described, thus failing to meet the pleading standards for securities fraud actions.  The Complaint begins by describing the five problem areas allegedly plaguing Pitney, then goes on to lay out the six suspect statements, each of which is alleged to be false because the defendants failed to disclose and/or misrepresented one or more of the following issues: (a) Pitney "was experiencing a slowdown in sales of equipment and software and supplies to the financial services sector; (b) revenues in the [] U.S. Mailing segment had dramatically declined and were not performing according to internal expectations;" (c) Pitney's international operations were not performing in line with internal expectations "as market liberalization and deregulation were causing customers to delay purchasing decisions;" (d) customers were

increasingly dissatisfied with Pitney and many sought to cancel their contracts;
(e) "there was a large backlog of a reduction in fees due to Pitney [] as a result of
delays in contract cancellations or customer retentions through re-negotiated
fees;" (f) Pitney was not meeting internal sales goals or making progress against
its long-term goals; and (g) there was a large backlog of undisclosed customer
cancellations and reduced fees.  Plaintiff purports to support each of these
allegations with a host of facts about Pitney's business operations prior to and
during the Class Period that are in large part anecdotal, localized and vague.

Plaintiff supports its allegation that revenues in the U.S. Mailing segment
had declined and the segment was not performing to internal expectations due in
part to "a slowing in the customers' migration from older mail meters to new
digital meters" with a handful of unparticular allegations.  [Dkt. 66, Compl. ¶ 30].
Plaintiff alleges that prior to and during the Class Period Pitney represented the
switch from analog to digital meters to be an area of growth.  [*Id.* at ¶ 31].
Plaintiff, however, identifies no public statement in which this switch is
represented as an area of future growth.  In fact, as discussed above, Defendant
Martin explained to investors that the economic benefit of a switch from analog to
digital postal meters was a "bubble" and a "one-time positive" in the second
quarter.  [Dkt. 70-4, 7/30/07 Conf. Call Transcript p.7].  Plaintiff also contends that
Pitney misrepresented to customers that their analog meters must be converted
to digital meters and that this misrepresentation misled customers and prompted
them to attempt to cancel their contracts.  [Dkt. 66, Compl. ¶ 32].  Again, though,
Plaintiff identifies no specific source for this belief as required by Rule 9 and the

PSLRA, nor does it specify either any particular customers who were outraged or who attempted to cancel their contracts, or note whether such customers actually canceled their contracts.  Further, Plaintiff speaks in generalities in quantifying customer dissatisfaction, stating that *some* customers informed Pitney that they believed they were misled about the need to upgrade their analog machines and *many* of these then attempted to cancel.  [*Id.* at ¶¶ 32, 33].  How many and which customers believed that they were misled?  How many of these then attempted to cancel their contracts and when?  How do these cancellation numbers compare to cancellation numbers prior to the Class Period?  No other allegation in the Complaint refers to the U.S. Mailing segment of Pitney's business specifically. Without more, the above assertions are too vague to meet the particularity requirement.  *See, e.g., In re Health Mgmt. Sys., Inc. Sec. Litig.*, 97 CIV. 1865 (HB), 1998 WL 283286, at *4 (S.D.N.Y. June 1, 1998) (dismissing "general, conclusory allegations" as "wholly insufficient" where they did not "specify the customers involved, the nature of the customer's supposed payment problems, the nature or genesis of the alleged "increased competition," or the extent of the alleged lower margins or decreased profitability," where the "essence of the plaintiffs' complaint is that defendants made statements about the company's financial situation, but failed to disclose the financial difficulties that the company was having.").

Although Plaintiff spends several paragraphs describing Pitney's internal forecasts and sales numbers, it fails to connect any sales number or projection to any of the seven business groups within Pitney Bowes, opting instead to allege in

broad strokes that Pitney's business was down.  Nor does plaintiff elucidate from whom this information came or whether any particular Defendant was in privity with the source of such information.  Instead, Plaintiff alleges that projections went "up the ladder."  The vagueness of these allegations fails to meet the heightened pleading standards under Rule 9 and the PSLRA and, arguably, fails to state a claim upon which relief may be granted under the *Iqbal* pleading standard.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (citations and internal quotations omitted).

Plaintiff also alleges that Pitney's international operations did not meet internal expectations because market liberalization and deregulation caused customers to delay purchasing decisions.  Again, Plaintiff supports this allegation with only the barest of facts: that a change in the method of meter rentals in France was causing delayed purchasing decisions, and in the U.K., a mail strike caused significant disruptions and negatively impacted purchasing decisions.  [Dkt. 66, Compl. ¶ 41].  Plaintiff does not specify when the two events took place, what impact they had on overall operations, or how or when Pitney gained any knowledge of these incidents.  Plaintiff also contends that a July 2007 annual meeting of the International Mail Services division supports its assertion.  However, Plaintiff admits that only forty sales representatives were present and that managers announced that sales were down.  [Dkt. 66, Compl. ¶ 42].  Plaintiff

provides no context for this annual meeting: the Court cannot glean whether this meeting took place before or after the start of the Class Period, the order of magnitude of the decline, what impact a division having only forty sales people had on a company with 35,000 employees, or whether this was even a meeting of employees of the division which Plaintiff alleges suffered a decline in sales.  To clarify, it appears that Plaintiff's allegations intend to refer to a decrease in revenue in the International Mailing division; however, this meeting appears to have been for employees of the Mail Services division of Pitney which, according to Pitney's 10-Q, is entirely separate.  [Dkt. 70-5, 10-Q at 7. Segment Information p.12].

Plaintiff's assertion that Pitney was experiencing a slowdown in sales of equipment, software and supplies to the financial services sector suffers from the same fatal pleading flaws.  Of the 92 paragraphs in the Complaint, only two contain information pertaining to this allegation.  In the first, Plaintiff alleges cursorily that the slowdown began "by the start of the class period," that HSBC, purportedly one of Pitney's largest customers, was "extremely affected by the economy and was reducing its marketing efforts," and that Pitney saw a "slowdown in sales, lack of sales, or cancellations" from customers including Fidelity, Washington Mutual, Toronto Dominion Bank, the Province of New Brunswick, Citicorp, Chase, Standard Register, State Farm Insurance, GM, and other insurance brokerage clients.  [Dkt. 66, Compl. ¶ 43].  Plaintiff does not, however, explain *how* a reduction in HSBC's marketing efforts affected Pitney's financial results, *when* Pitney was affected by a slowdown in business with the

other clients listed, or whether Pitney *knew* of clients' intention to scale down business with Pitney by the start of the Class Period and prior to the date the statements were made.  Each of the allegations above is conclusorily pled under *Iqbal* and far too bare to meet the particularity requirements of the Rule 9(b) and the PSLRA.  *See Iqbal, supra*.

Plaintiff also alleges that Pitney suffered a slowdown from Countrywide Financial, "a critical account in the Company's San Bernardino district," which saw Countrywide stop buying new equipment and reallocating its old equipment among remaining offices.  Here, too, though, Plaintiff has failed to allege in what time frame this occurred; if the slowdown occurred after the start of the Class Period, then it is entirely irrelevant as Plaintiff has failed to allege any specific fact that would allow the Court to conclude that Pitney *knew* that it would lose significant business from Countrywide.  Furthermore, this allegation lacks any context to establish its materiality. The Complaint does not allege how much of Pitney's total business revenue was derived from Countrywide's San Bernardino office, how much of Pitney's business came from the San Bernardino area, or the impact such a decline in sales had on Pitney's overall results. Plaintiff has alleged no facts establishing that the decline in sales to Countrywide was a significant or material factor in Pitney's disappointing results.  The Court notes that Pitney reported some 2 million customers worldwide, 35,000 employees, and revenue of a little less than $6 billion in 2006.  [Dkt. 70-2, Citigroup Tech. Conf. transcript at 1].  These allegations are simply too vague to meet the required particularity standard.

Plaintiff's allegations of customer dissatisfaction and delays in contract cancellations also fall woefully short of the pleading standard.  Paragraphs 45 through 53 detail the various forms of customer dissatisfaction, including the alleged difficulty in canceling contracts, but notably absent is any reference to a time period in which these problems took place or even for how long Pitney's cancellation procedures had been in place before the start of the Class Period. Plaintiff alleges time in generality only, using terms such as *increasingly* dissatisfied, *often* frustrated, *often* learned, and *often* attempted, but without any further specificity.  As a consequence, it is impossible to ascertain for how long these alleged problems in customer relations existed prior to the Class Period, and thus provides the Court with no way to ascertain what, if any, impact these problems had on the alleged catastrophic shift in Pitney's business.  Allegations that are so amorphous as to time periods are not pled with the requisite specificity.  *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (holding that complaint failed under Rule 9(b) where "allegations are either undated or pegged to an indefinite time period (i.e., 'after the acquisition')" and concluding that "allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants at the time of an alleged misstatement"); *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) *aff'd sub nom. Condra v. PXRE Group Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (finding no inference of scienter where "several of Plaintiff's allegations involve[d] either vague dates, or dates that occurred after" the allegedly fraudulent statements were made).

58

The only firm date Plaintiff alleges is that, around 2006, Pitney attempted to consolidate its billing systems, which led to errors on bills and customer attempts to cancel contracts.  However, if this problem began in 2006 and Pitney continued to see solid profit margins in the quarters that preceded the Class Period which ended in October 2007 (Pitney met its second quarter projections), the Court cannot conclude, without more specific allegations, that this consolidation contributed to the shift in Pitney's business.

Furthermore, the Court notes that Plaintiff's Complaint characterizes customer cancellations mostly in terms of contracts for postal meters.  [Dkt. 66, Compl. ¶¶ 46-53].  The two statements most closely related to this allegation are those in which Pitney speaks to its "excellent customer retention" (Occasion 2) and in which Martin states that Pitney is "seeing a lower cancellation rate" such that its "retention rate of our existing customers is also stronger that it has been" (Occasion 4).  Plaintiff neglects, however, to specify that both of these statements refer specifically to customer retention and customer cancellations in "PBMS," or Pitney Bowes Management Services, which appears to be a business segment distinct from that servicing postal meters, and about which Plaintiff fails to plead any other allegation of fraud.  This complete disconnect does not meet the requirements of particularity.  *See In re Alcatel*, 382 F. Supp. 2d at 531-32 ("But Plaintiffs' allegations of fraud, which relate to Alcatel in general, and the Prospectus Statement, which addresses the Optronics Division specifically, do not connect with sufficient particularity to meet the Rule 9(b) pleading requirements for the Prospectus Statement with this explanation of why they

believe the Prospectus Statement was fraudulent.  In addition to this disconnect, the presence of an affirmative statement that is made misleading by the material omission is a threshold requirement" under section 11, and a pleading that sets forth only vague assertions that a false and misleading impression was created by alleged omissions is not sufficient.").

Finally, the Complaint purports to offer facts relating to the decline in Pitney's business that Plaintiff never connects to any allegedly false statement or to the problem areas it lists as those that Pitney should have disclosed.  For instance, Plaintiff alleges that Pitney failed to offer innovative products and services, that it faced intense competition as a result, and that the company's sales representatives "did nothing for the rest of the year" after May 2007 because customers had already opted to buy add-ons to existing equipment. [Dkt. 66, Compl. ¶¶ 34-36].  These facts, even when taken as true, are irrelevant as Plaintiff has utterly failed to connect them in any way to its allegations of fraud.

In sum, Plaintiff's Complaint fails to offer any concrete dates or assertions such that the Court may conclude that Plaintiff has met the pleading requirements under either the PSLRA or Rule 9(b).  These problems are endemic throughout the Complaint; although the Court has given specific examples above, it has not exhausted each such example of deficient pleading in Plaintiff's submission.

e.  <u>No allegation of falsity as to statements of present or historical fact</u>

The Complaint is also deficient in that it contains no particularized facts indicating that statements of present or historical fact were false when made.  As noted above, statements of present or historical fact are not subject to the safe harbor for forward-looking statements.  *Authentidate*, 369 F. App'x at 264. Additionally, because of the heightened pleading standard for securities fraud claims necessitating a compelling inference of scienter (*see infra*), "liability for [statements of current fact] attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 773; *see also In re Gilat Satellite Networks, Ltd.*, CV-02-1510 (CPS), 2005 WL 2277476, at *15 (E.D.N.Y. Sept. 19, 2005) ("a statement of present or historical fact is actionable only if made with actual knowledge of falsity or recklessness." ).

Here, Plaintiff categorically alleges that Defendants' statements as to their "excellent customer retention" (Occasion 2), and "lower cancellation rate" (Occasion 4), were fraudulent when made.  However, Plaintiff has failed to allege any fact that would allow the Court to reach this conclusion.  As noted previously, these statements refer specifically to customer and cancellation rates in Pitney's Management Services sector, not to the sectors in which Plaintiff alleges customers were cancelling contracts or were dissatisfied.  Just as this disjoint precludes a finding that the pleading requirements have been met, so too does it preclude a finding that these statements were false when made; Plaintiff does not allege that PBMS (Pitney Bowes Management Services) did *not* enjoy excellent customer retention or have a "lower cancellation rate."  Likewise, another allegedly fraudulent statement refers to Pitney's "lease portfolio [that]

61

gets richer later in the year."  Again, though, Plaintiff does not allege anywhere that Pitney's lease portfolio did *not*  get richer in the second half of each year; rather, Plaintiff only alleges that Pitney's U.S. and International Mailing segments saw losses beginning in the third quarter.  Because Plaintiff fails to state with particularity how these three statements were false when made, they are thus inactionable.

Statement 6 (Occasion 6) refers to Pitney's "recurring revenue stream" which makes Pitney "quite predictable" and "quite consistent in [its] results," and references the company's consistent cash flow year-over-year.  Here, again, Plaintiff does not allege specifically how this statement was false, especially in light of its explicit recognition that Pitney had met its internal financial projections for the 28 quarters prior to the Class Period.  Based on this representation of stability and absent a successful showing of scienter (*see infra*), the Complaint contains no factual basis upon which the Court may infer that Pitney had *not* been, at the time the statement was made, predictable or consistent, or that it did not enjoy consistent cash flow year-over-year.

Such recitations of historical fact, without more, are not actionable.  *See In re Duane Reade Inc. Sec. Litig.*, 02 CIV.6478 NRB, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999)) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy."); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006)

(dismissing positive statements about Nokia's product mix and growth in global market: "[a]s logic dictates, disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."); *In re Bayer AG Sec. Litig.*, 03 CIV.1546 WHP, 2004 WL 2190357, at *11 (S.D.N.Y. Sept. 30, 2004) ("statements describing [a drug]'s strong sales record are not actionable since they are merely recitations of historical fact and are not alleged to be inaccurate"); *Gissin v. Endres*, 739 F. Supp. 2d 488, 511 (S.D.N.Y. 2010) ("It is well-established ... that defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.").

      f.  <u>Scienter</u>

Plaintiff's Complaint fails to plead the essential element of scienter.  This failure is fatal.  "The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  "Under this heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Slayton*, 604 F.3d at 766 (quoting *Tellabs*, 551 U.S. at 324).  The proper inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at, 322-23.  The "strong inference" standard is met when the

inference of fraud is at least as likely as any non-culpable explanations offered. *Slayton*, 604 F.3d at 766 (quoting *Tellabs*, 551 U.S. at 324).  This inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."  *Tellabs*, 551 U.S. at 324.

A plaintiff may show an inference of scienter in two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Further, "because the safe harbor specifies an actual knowledge standard for forward-looking statements, the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 773.

Here, Plaintiff alleges that (1) it need not allege actual knowledge as to any fraudulent statement because none of the statements is forward-looking (a claim that this Court does not credit); (2) even if actual knowledge is necessary, Plaintiff has met this burden; and (3) Plaintiff has sufficiently alleged conscious misbehavior and recklessness.  The Court disagrees.

### i. Motive and opportunity to commit fraud

In the scienter analysis, "[o]pportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."  *Shields v.*

64

*Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).  As two of the highest ranking officers of Pitney, Defendants Martin and Nolop had the opportunity to commit fraudulent acts.  *See Kalnit v. Eichler*, 99 F. Supp. 2d 327, 335 (S.D.N.Y. 2000) *aff'd*, 264 F.3d 131 (2d Cir. 2001) (directors of company had opportunity to commit fraud); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) (individual defendants had opportunity to manipulate company stock where they held the highest positions of power and authority within the company).

Plaintiff has failed, however, to proffer sufficient evidence of any motive Pitney or the individual Defendants may have had to fraudulently overstate its financial projections for the third quarter or to omit material information from its statements.  Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *Shields*, 25 F.3d at 1130.  In order to raise a strong inference of scienter by this method, Plaintiff must allege that Pitney or its officers "benefitted in some concrete and personal way from the purported fraud."  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  The Second Circuit has held generally that, among others, (1) "the desire for the corporation to appear profitable," (2) "the desire to keep stock prices high to increase officer compensation," and (3) the "desire to

maintain the appearance of profitability" are such insufficient motives.  *Id.*;

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d

190, 196 (2d Cir. 2008).  *See also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir.

1996) ("such a generalized motive [as the desire to justify an investment and

make it appear profitable], one which could be imputed to any publicly-owned,

for-profit endeavor, is not sufficiently concrete for purposes of inferring

scienter.").

The Complaint contains only one potential allegation of motive: that Pitney

benefitted from Defendants' fraud on or about September 6, 2007 when it issued

$500 million in debt securities to investors.  [Dkt. 66, Compl. ¶ 83].  An allegation

that issuance of debt securities may provide motive, however, fails as a matter of

law.  *San Leandro*, 75 F.3d at 814 ("We do not agree that a company's desire to

maintain a high bond or credit rating [to maximize the marketability of $700

million in debt securities] qualifies as a sufficient motive for fraud in these

circumstances, because if scienter could be pleaded on that basis alone, virtually

every company in the United States that experiences a downturn in stock price

could be forced to defend securities fraud actions"); *Leventhal v. Tow*, 48 F.

Supp. 2d 104, 115 (D. Conn. 1999) ("Since *San Leandro* the courts of this Circuit

have interpreted the decision as an "unequivocal rejection of the concept of

motive predicated upon desire to maximize the marketability of debt securities

and to minimize interest rates."); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp.

2d 432, 450 (S.D.N.Y. 2005) ("courts in this Circuit have consistently held that

allegations that a defendant was motivated to commit securities fraud by a desire

to reduce its debt burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter inference").  Absent any other allegation of motive, the Court may not infer either that Martin, Nolop, or Pitney had any specific motive to commit fraud.  Plaintiff fails to allege scienter based on the motive prong.

### ii.  Actual knowledge / proof of knowing falsity

Plaintiff has likewise failed to allege that the Defendants had actual knowledge of the falsity of the statements at the time they were made, as explained in detail above.  Because Plaintiff has failed to meet the particularity requirements of Rule 9(b) or the PSLRA and has had failed to allege with particularity facts which if proved would establish that the statements were false when made, the Court cannot credit Plaintiff's allegations that each of the allegedly fraudulent statements were made with *actual* knowledge of their falsity. Plaintiff's suggested inferences are not plausible in light of the extensive foregoing discussion.  *See supra*.

### iii.  Conscious misbehavior or recklessness

In the absence of sufficient allegations of falsity, the Complaint may only survive if Plaintiff proffers facts lending credence to a strong inference of conscious misbehavior or recklessness, although "the strength of the circumstantial allegations must be correspondingly greater if there is no motive," as here.  *ECA, Local 134 IBEW Joint Pension Trust*, 553 F.3d at 199.  "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete

and personal way from the purported fraud; (2) *engaged in deliberately illegal behavior*; (3*) knew facts or had access to information suggesting that their public statements were not accurate*; or (4) *failed to check information they had a duty to monitor*." *Id.* at 199 (internal quotation marks and citations omitted).

"[T]he scienter element can be satisfied by a strong showing of reckless disregard for the truth . . . [or] conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009). "To establish scienter through strong circumstantial evidence of recklessness, a plaintiff must allege facts showing 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendants must have been aware of it.'" *In re CRM Holdings, Ltd. Sec. Litig.*, 10 CIV. 975 RPP, 2012 WL 1646888 (S.D.N.Y. May 10, 2012) *recon. denied*, 10 CIV 00975 RPP, 2013 WL 787970 (S.D.N.Y. Mar. 4, 2013) (citing *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000)); *S. Cherry Group*, 573 F.3d at 109 (quoting same). A plaintiff may also plead scienter by sufficiently alleging "that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud, and hence should have known that they were misrepresenting material facts." *S. Cherry St.,* 573 F.3d at 109. Further, securities fraud claims will suffice "when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" and where they "specifically identify the reports or statements

68

containing this information."  *Novak v. Kasaks*, 216 F.3d 300, 308, 309 (2d Cir. 2000).

Here, Plaintiff alleges that Defendants Martin and Nolop, because of their positions within Pitney, directly participated in the management of the company, were directly involved in its day-to-day operations, and "had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents, . . . conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith."  [Dkt. 66, Compl. ¶¶ 9, 10].  Further, Plaintiff contends that Martin and Nolop controlled the content of Pitney's SEC filings, press releases and other public statements and had a duty to promptly disseminate accurate and truthful information with respect to Pitney and to correct any statements that had become materially misleading or untrue.  [*Id.* at ¶¶ 11, 13].  Plaintiff contends that the Defendants participated in fraudulent activity by virtue of their (1) "receipt of information reflecting the true facts regarding Pitney Bowes," and (2) "control over, and/or receipt and/or modification of Pitney Bowes' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Pitney Bowes."  [*Id.* at ¶ 78].

Plaintiff's allegations fall far short of pleading a compelling inference (indeed, *any* inference) of conscious misbehavior or recklessness in light of the massive pleading deficiencies posed by Plaintiff's Complaint, as discussed extensively above.  Plaintiff has failed to plead with any specificity when the problems confronting Pitney occurred, how the alleged misstatements were false at the time they were made, how Pitney learned of the falsity of its statements and/or omissions, or the relationship between the problem areas alleged and the specific statements uttered.  Pleading a compelling inference of scienter, then, in light of these deficiencies, would be nigh impossible.  Although Plaintiff may well allege that Martin and Nolop had access to information, Plaintiff fails to plead with any specificity to *what* information the Defendants had access that would have apprised them of the falsity of their statements *at the time the statements were made*.  *See In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) *aff'd sub nom. Condra v. PXRE Group Ltd.*, 357 F. App'x 393 (2d Cir. 2009) ("Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements").  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.  Plaintiffs here allege only that Defendants Martin and Nolop had access to unspecified *information* about the problem areas facing Pitney and to unspecified sales reports and/or forecasts.  As discussed earlier, Plaintiff has failed to connect any particular sales report or forecast to any company-wide financial report or

forecast and has failed to state what information in those amorphous  sales

reports and forecasts would have made Defendants' statements, at the time they

were uttered, false or misleading.  The vague and generalized allegations of the

mere existence of the reports, particularly absent any assertion that any

Defendant actually saw or was aware of them, and thus was conscious of them,

fails to establish either conscious misbehavior or conduct which was highly

unreasonable such that it represents an extreme departure from the standards of

ordinary care, to the extent that the danger was either known to the Defendants or

so obvious that the Defendants must have been aware of it; and thus, the

Complaint fails to establish an inference, much less a compelling inference of

scienter.  *See San Leandro*, 75 F.3d at 812 ("Plaintiffs' unsupported general claim

of the existence of confidential company sales reports that revealed the larger

decline in sales is insufficient to survive a motion to dismiss").

 Thus, without an adequately pled contention of falsity to form the basis of

its Complaint, and without an adequate allegation that information existed to

contradict the truth of the statements at the time the statements were made, this

Court cannot infer scienter.  These collective missteps are fatal.  *See, e.g.*, *In re

Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 274, 273 (S.D.N.Y. 2009)

(complaint did not sufficiently plead scienter where it failed to alleged "when

[alleged problem within the company] occurred, when or how the Company

learned or should have learned of it, or the effect it had on [the company]'s

business.") ("The Complaint's general allegations that, by virtue of their senior

positions at [the company], the Individual Defendants necessarily had access to

nonpublic information, are insufficient to show recklessness under the law of this Circuit."); *In re WEBMD Health Corp. Sec. Litig.*, 11 CIV. 5382 JFK, 2013 WL 64511, at \*12 (S.D.N.Y. Jan. 2, 2013) (holding that defendants lacked scienter where "there is a missing link between Defendants' cognizance of potentially adverse business conditions and Plaintiff's accusation that the statements and projections were not simply too optimistic but actually false and made with an intent to deceive, manipulate, or defraud," and concluding that only compelling inference is that defendants were mistaken about contemplated adverse business conditions).

Plaintiff also attempts to plead scienter through fourteen confidential witnesses.  Information from confidential witnesses may be relied upon so long as "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314 (2d Cir. 2000).   The Complaint, however, contains allegations and facts from only four of these confidential witnesses, none of which are successful in establishing an inference of recklessness or conscious misbehavior.  [Dkt. 66, Compl. ¶ 79].  Specifically, there is no allegation that any witness (1) met or had any contact with either Martin or Nolop, (2) reported any concerns regarding any of the alleged omissions, misrepresentations, or problem areas to the Defendants, (3) played any direct or meaningful role in the company-wide financial forecasting or reporting process, (4) was privy to all of the reports and forecasts compiled or considered in generating the company-wide figures, reports and forecasts that

72

Plaintiff alleges to be false, (5) accused Pitney of any type of fraud, (6) can provide facts supporting Plaintiff's contention that Defendants knew of the alleged problem areas facing Pitney and disregarded those problems, or (7) identified any report that would tend to show that the Defendants knew that the statements were fraudulent when made.  Notably, the Complaint does not attribute any allegation regarding the five alleged problem areas to any of the confidential witnesses.

The descriptions of each witness also fail to specify the date range of their alleged knowledge or to establish any nexus between happenings in regional offices and those on a company-wide level.  Further, no witness is alleged to have had any connection to the company-wide quarterly financial projections.  In fact, the only witness alleged to have had any role in formulating financial projections and to whom any allegation is attributed is CW13, the head of Sales Operations and Finance for Pitney from 2001 to 2010 and also the Vice President of Channel Management, who was responsible for forecasting sales for postal meters during the Class Period.  [Dkt. 66, Compl. ¶¶ 22, 82].  Plaintiff makes no allegation, however, either that CW13's forecasts were or were *not* incorporated in Pitney's company-wide sales projections, that CW13's forecasts were fabricated or inaccurate in any way, or even that CW13 believes the allegedly fraudulent statements to have omitted any material information.

Moreover, only CW9 is alleged to have had any attenuated contact with Defendants Martin or Nolop, and no allegations are attributed to him.  Plaintiff contends that CW9 reported directly to the Vice President of Corporate Risk, who

73

in turn reported to the Executive Vice President of Finance, who then in turn reported to Pitney's CFO, Defendant Nolop.  [Dkt. 66, Compl. ¶ 22].  Despite this line of communication and although Plaintiff alleges that CW9 was involved with customer cancellations, there is no allegation that CW9 observed increasing customer cancellation trends, reported any concerns to his superiors, or had any connection to financial reporting or projecting on a company-wide level (or even on a regional level, much less an international level).  CW9, then, does not provide the Court with an inference of scienter.  *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) ("[T]here is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period. The absence of such communication undermines the inference that Defendants recklessly disregarded the truth about Wachovia's mortgage portfolio while publicly trumpeting the virtues of the Pick–A–Pay product."); *In re Am. Express Co. Sec. Litig.*, 02 CIV. 5533 (WHP), 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010) (no inference of scienter where "Plaintiffs have also failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period").

Plaintiff's vague and unsubstantiated confidential witness allegations therefore fail to meet the heightened pleading standard described above and do not provide the Court with a compelling inference of scienter.  *See In re*

*Wachovia*, 753 F. Supp. 2d at 352 (confidential witness "allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants at the time of an alleged misstatement" and thus may not provide an inference of recklessness); *Gavish v. Revlon, Inc.*, 00 CIV. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ("affixing the phrase 'former employees have stated' to [an] otherwise totally unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA" where sources were not described with sufficient particularity to permit the assumption that a witness in a particular position would possess the knowledge alleged); *accord Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010) (finding an inference of scienter where "Plaintiffs have pled with particularity the knowledgeable positions occupied by each of the CWs, many of whom had first-hand interactions with the Defendants concerning the matters alleged in the Complaint.").

   In sum, Plaintiff's allegations, when considered collectively and in light of the Complaint's extensive pleading deficiencies, do not create an inference of scienter, let alone a compelling one.  *See, e.g., Tellabs*, 551 U.S. at 326 ("omissions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'").

   g.  <u>Control Person Liability under Section 20(a)</u>

Finally, Plaintiff alleges control person liability under Section 20(a) of the Exchange Act against Defendants Martin and Nolop.  Section 20(a) provides that

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns,* 493 F.3d at 108.  Because Plaintiff has failed to establish a violation of section 10(b) of the Exchange Act, Plaintiff's allegation of control person liability under section 20(a) cannot stand.  Accordingly, this count is dismissed.

IV.   <u>Conclusion</u>

For the foregoing reasons, Defendants' [Dkt. 68] Motion to Dismiss the Second Amended Complaint is GRANTED.  In so far as Plaintiff has been given two opportunities to amend its Complaint since this case was filed more than three years ago, Plaintiff was aware of deficiencies in its first Amended Complaint upon Defendants' filing of their first motion to dismiss in 2010 and filed its Second Amended Complaint in lieu of opposing that motion, Plaintiff has been aware of the deficiencies in this Second Amended Complaint since the instant

76

motion to dismiss was filed more than a year ago, Plaintiff has not sought leave to amend the current Complaint, and other bases for dismissing the Second Amended Complaint exist,[18] the Court infers that further leave to amend the Second Amended Complaint would be futile.  Accordingly, the case is DISMISSED.  The Clerk is ordered to close the case and enter judgment in favor of Defendants.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 23, 2013

---

[18] This Court has attempted to lay out with clarity the reasons that Plaintiff's Complaint must fail in light of the particularized pleading standards necessary for securities fraud actions.  The Court has not, however, addressed every possible reason why the Complaint should be dismissed. In particular, Defendants' argue persuasively that some of the statements at issue constitute inactionable puffery and that Plaintiff has pled "fraud by hindsight."